John ORTIZ, Plaintiff,

v.

PRUDENTIAL INSURANCE
CO., Defendant.

No. 3:97CV2150 (JBA).

United States District Court,
D. Connecticut.

March 22, 2000.

Ikechukwu Umeugo, Umeugo & Assoc., West Haven, CT, for John Ortiz, plaintiff.

Robert B. Flynn, Tyler, Cooper & Alcorn, New Haven, CT, Tracy C. Missett, Peter A. Walker, Seyfarth, Shaw, Fairweather & Geraldson, New York City, for Prudential Insurance Co. of America, defendant.

### MEMORANDUM AND RULING [DOC. # 38]

ARTERTON, District Judge.

Plaintiff John Ortiz (Ortiz) claims that the defendant Prudential Insurance Company (Prudential) terminated him because of his national origin in violation of Title VII. The defendant denies that national origin played any role in its decision to terminate Mr. Ortiz' employment, and asserts that he was terminated because he repeatedly violated company rules and collective bargaining agreement provisions prohibiting outside employment during the workweek. Defendant moved for summary judgment, to which plaintiff responded, and the Court heard oral argument on February 29, 2000. For the reasons that follow, Defendant's Motion for Summary Judgment [doc. # 38] is GRANTED.

### I. FACTUAL BACKGROUND

Plaintiff was employed as a sales agent in Prudential's New Haven district office beginning in June of 1984. According to plaintiff, from the beginning of his employment, staff managers and general managers made discriminatory remarks about minorities, refused to work in the field with non-white agents, and on one occasion disregarded plaintiff's "bid" on the sales book of a retiring employee. The managers alleged to have participated in this

activity are Al Percelli, Harry Varlarde, Robert DeRosier, Mark Farrell and Mike Amatrudo, along with the unnamed white sales managers who refused to work in the field with plaintiff. *See* Ortiz Aff. ¶¶ 1–5. Plaintiff claims that minority employees' scores, presumably on some sort of employment application exam, were altered in order to justify discriminatory treatment. Plaintiff also alleges that he was required to attend "reporting meetings" on Tuesday and Friday mornings, and was disciplined if he failed to do so, while white agents had "the run of the office," and came and went at will.

In order to comply with the rules of the National Association of Securities Dealers, with which he was required to be registered in connection with his work selling insurance policies, plaintiff was obliged to complete a "Uniform Application for Insurance Registration or Transfer," known as the Form U–4, and report his involvement in any business other than Prudential "either as a proprietor, partner, officer, director, trustee, employee, agent or otherwise." He was also obligated to amend the Form U–4 if he became engaged in any additional business activities.

Plaintiff was further restricted in his outside employment by his Agent's Agreement and Article 26 of the collective bargaining agreement between Prudential and the United Food and Commercial Workers. Article 26, known as the "two job rule," prohibited other work or employment that "interfere[d] to any extent whatsoever with the full-time performance of the job as Prudential Representative" and further provided in pertinent part that "[e]ngaging at any time on Monday, Tuesday, Wednesday, Thursday or Friday in any other work, occupation, or activity from which a Prudential Representative is to receive, directly, indirectly, financial remuneration or profit shall be a violation" of the two job rule.[1] In addition, the Agent's Agreement prohibited Mr. Ortiz from run-

---

1. The relevant provision of the Agent's Agreement bound Mr. Ortiz to "promote the success and welfare of the Company; conform to and abide by its instructions, rules and re- quirements; and refrain from engaging in any other pursuit or calling from which I receive

ning any advertisements that had not been previously approved by the Company. Def.Ex. 5, Sec. 11.

In late 1994, Mr. Ortiz was disciplined for a non-compliant advertisement that he ran in the Yellow Pages. Although a copy of the offending advertisement is not apparently in the record, internal correspondence indicates that Prudential had not authorized the advertisement, and that it viewed the advertisement as revealing several potential violations of the two job rule, in that it listed "business" insurance, a line not marketed by Prudential, identified Mr. Ortiz as a "realtor," and offered notary public services, all during the Monday through Friday hours of operation listed in the advertisement. In response to a request for clarification of some of the issues raised in the advertisement, Mr. Ortiz responded that he only charged non-clients for notary services, and that it was more along the lines of a service to the Hispanic community since so few notaries spoke Spanish; that his reference to "business" insurance meant only pension plans, a line marketed by Prudential; and that he identified himself as a "realtor" only to "enhance his image to [the] public." While he did maintain a real estate license, he explained, he did so only for his "personal investment portfolio." Def.Ex. 30. Prudential was apparently not satisfied with his explanation, and issued him two warning letters on March 15, 1995. The first

financial remuneration...." Def. Ex. 5, Sec. 1.

The Agent's Agreement was included within and modified by the Collective Bargaining Agreement between Prudential and the United Food & Commercial Workers Union (UFCW), the union representing Prudential's sales agents. Article 26 of the CBA provides in its entirety as follows:

1. Section 1 of the Prudential Representative's Agreement is hereby modified to read as follows:

Sec. 1.(a) The Prudential representative will promote the success and welfare of the Company and conform to and abide by its instructions, rules and requirements.

Sec. 1.(b) The Prudential Representative recognizes that the job of Prudential Representative requires his or her full time in order that he or she may render proper sales, conservation, and insurance service to the policyholders on the debit and to the insuring public in the territory in which the Prudential Representative operates, and therefore, agrees that he or she will not engage in any other work, occupation, or activity which will interfere to any extent whatsoever with the full-time performance of the job as Prudential Representative and from which he or she is to receive, directly or indirectly, financial remuneration or profit.

2. The following rules shall control in interpreting and applying Section 1(b) of the Prudential Representative's Agreement as above modified:

a. Engaging at any time on Monday, Tuesday, Wednesday, Thursday or Friday in any other work, occupation, or activity from which a Prudential Representative is to receive, directly, indirectly, financial remuneration or profit shall be a violation of Section 1(b).

b. Except as provided in section 3, selling or soliciting at any time any kind of insurance for any other company or rendering any service on insurance issued by another company for which the Prudential Representative is to receive, directly or indirectly, financial remuneration or profit from that company shall be a violation of Section 1(b); except that, when an application for an individual life or health insurance policy or an individual annuity has been submitted to the Prudential, and the Prudential, having received all the information necessary for consideration of the application, has declined to issue the policy applied for or to issue an alternative kind of policy in any amount or on any basis, the Prudential Representative may submit an application to another insurance company for a comparable type of insurance or annuity, and such submission will not be a violation of Section 1(b).

c. Any violation of Section 1(b) after written warning to discontinue such other work, occupation, or activity given prior or to the date of this Agreement or during the period therefor shall be sufficient cause for termination of any prudential Representative's services and agreement. It is agreed that such termination is within the reasonable exercise of Managerial discretion.

letter warned Mr. Ortiz that if he sold insurance or engaged in any other occupation or activity in violation of the two job rule, "your services and Agreement will be terminated." Def.Ex. 33. The second letter reminded Mr. Ortiz of his obligation to secure approval of any further advertisements, and warned of "severe disciplinary action" as a consequence of any future violations. Def.Ex. 25.

In November of 1995, General Manager Al Spaziano conducted a private office visit of the Ortiz Insurance Agency. While Prudential sales agents were allowed to operate out of independent private offices, such offices must meet Prudential guidelines, including: Prudential business must be conducted in an area "physically separate" from any other business; the Prudential office may not share a telephone line with any other business, and the private office line must be answered in a manner that identifies the office as affiliated with Prudential; any advertising and signage for the office must be approved by Prudential; and any clerical personnel must be Prudential employees, or provided by an approved temporary service. Alston Aff. ¶ 10.

During Spaziano's private office visit, he noted that Mr. Ortiz "has real estate office also—no separate line." Private Office Visit Checklist, Def.Ex. 36, p. 4. He also found potentially non-compliant business cards and advertisements. *Id.* at p. 6; Def.Ex. 37, 39. Spaziano observed an unapproved sign, and noted that he "told [Mr. Ortiz] has to answer the phone representing Prudential." Def. Ex. 36, p. 10. Spaziano then forwarded his checklist and the information he had gathered to Mr. Sinha, who in turn asked Field Operations to investigate. Finnegan Aff. ¶ 7. Mr. Ortiz was also asked to respond in writing regarding some of Prudential's concerns;

he responded that: the unauthorized business cards and Yellow Pages advertisement had been discontinued effective January 1, 1996; that "the real estate issue has already been addressed in my last letter regarding this subject, please refer to it;" that the signs had come down with the move to his new office, and that the newspaper advertisement had been authorized. Def.Ex. 41. Patricia Finnegan, an employee in Field Operations, conducted the investigation and reviewed photographs of Mr. Ortiz' office, copies of his business cards and advertisements, and Mr. Ortiz' written statements. Finnegan Aff. ¶ 7. During the course of the investigation, Mr. Ortiz was also repeatedly reminded to answer the telephone in his private office visit with reference to Prudential, and was also asked regarding the employment status of a clerical assistant who had answered the telephone at his agency yet was not a Prudential employee, in contravention of Prudential's policy regarding private offices. Def.Ex. 38. Ms. Finnegan also states in her affidavit that she telephoned Mr. Ortiz' office during the workweek "in connection with her investigation" and was offered both real estate and travel services. Finnegan Aff. ¶ 9. She concluded that Mr. Ortiz was "marketing himself to the public as a provider of real estate services," and based on Mr. Ortiz' previous warning regarding the two job rule, recommended his termination to Mr. Luis Olerio, Mr. Sinha's replacement. Mr. Olerio agreed, and terminated Mr. Ortiz in a letter dated May 6, 1996. *Id.* ¶ 10. Mr. Ortiz apparently grieved this termination under the collective bargaining agreement, Def.Ex. 53, but the record does disclose the ultimate disposition of his grievance, although defendant claims it was dismissed as untimely. *See* Def. 9(c)(1) Statement, ¶ 79.[2]

---

**2.** In addition to the evidence outlined above, defendant submits voluminous additional material regarding Mr. Ortiz' alleged continuous violation of the two job rule between his initial warning and his termination in 1996. It appears, however, that most of this material was gleaned through litigation discovery, and was not available to the defendant at the time

Prudential made its termination decision. For instance, it is reasonable to presume that defendant did not have regular access to Mr. Ortiz' tax returns during his employment. Defendant has not demonstrated how this additional information is relevant to the Court's determination, as after-acquired evidence

On November 6, 1996 Mr. Ortiz filed a complaint with the Connecticut Commission on Human Rights and Opportunities (CHRO), which issued a right-to-sue letter on July 15, 1997. This suit followed.

## II. STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that a motion for summary judgment may be granted when "there is no genuine issue of material fact remaining for trial and the moving party is entitled to judgment as a matter of law." As a "general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Tomka v. Seiler*, 66 F.3d 1295, 1304 (2d Cir.1995). If, when viewing the evidence produced in the light most favorable to the non-movant, there is no genuine issue of material fact, then the entry of summary judgment is appropriate. *See Binder v. Long Island Lighting Co.*, 933 F.2d 187, 191 (2d Cir.1991).

In cases alleging employment discrimination, the Second Circuit has held that additional considerations must be taken into account when deciding whether summary judgment should be granted. *See Gallo v. Prudential Residential Services*, 22 F.3d 1219, 1224 (2d Cir.1994). In such cases, the trial court must be particularly cautious about granting summary judgment when the employer's intent is at issue, and affidavits and depositions must be scrutinized for circumstantial evidence that, if believed, would support the plaintiff's claim. *Id.* at 1224. The Second Circuit, however, has also recently reminded district courts deciding summary judgment motions in discrimination cases that such courts:

> must also carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence

that gives rise to mere speculation and conjecture. This undertaking is not one of guesswork or theorization. After all, "[a]n inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact [that is known to exist]." 1 Leonard B. Sand, et al., Modern Federal Jury Instructions ¶ 6.01, instr. 6–1 (1997). Thus, the question is whether the evidence can reasonably and logically give rise to an inference of discrimination under all of the circumstances.

*Bickerstaff v. Vassar College*, 196 F.3d 435, 447 (2d Cir.1999). Therefore, though caution must be exercised in granting summary judgment where intent is genuinely in issue, summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact. *See, e.g., Woroski v. Nashua Corp.*, 31 F.3d 105, 110 (2d Cir.1994); *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1118 (2d Cir.1988); *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985).

## III. DISCUSSION

### A. Failure to Obtain Right-to-Sue Letter

■ Defendant contends that since plaintiff has failed to demonstrate his receipt of the EEOC right-to-sue letter, or articulate any legitimate reason for this failure to exhaust, his Title VII claims should be dismissed. Plaintiff responds that the CCHRO Release to Sue letter attached to his complaint is in reality a "Joint" right-to-sue letter, since it references both the CCHRO and the EEOC complaint number. Defendants' statement of the law is correct, in that generally a plaintiff must file a charge with the EEOC prior to bringing suit under Title VII. In seeking to bar plaintiff's claim on these grounds, however, defendant fails to ac-

---

does not serve as a bar to liability, only to limit damages. *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 362–63, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995). The

Court therefore disregards any evidence in the summary judgment record that was not known to defendant at the time of Mr. Ortiz' termination.

knowledge the work-sharing arrangements entered into by state and federal anti-discrimination agencies. The CHRO is a deferral agency under which it has a work-sharing arrangement with the EEOC, whereby it is authorized to accept charges for the EEOC. Where both the EEOC and CHRO have jurisdiction, two charges are taken so that the matter may be "dual-filed," thus preserving both the state and federal rights of the charging party. *See* Jay S. Siegel, Connecticut Labor & Employment Law 7 (Peter A. Janus, ed.1995). Plaintiff's CHRO complaint included an EEOC charge form, and in practice this is often the way that EEOC proceedings are instituted, although the federal agency will defer to the state proceedings. *See* 29 C.F.R. §§ 1601.70, 1601.74, 1601.80.

On the record before the Court, it appears that Mr. Ortiz did file with the EEOC. In reality, then, defendants are attacking plaintiffs' failure to produce the EEOC right-to-sue letter, since in its Answer to Plaintiffs' Complaint, Prudential "admit[ted] the truth of the allegations contained in Paragraph 6 of the Complaint," the paragraph alleging that plaintiff had exhausted his administrative remedies and received a "joint" right to sue notice.

Defendants have pointed to no cases where Title. VII claims have been dismissed for failure to produce the document from the EEOC where the state agency actually processed the charge and had provided plaintiff with a release to sue. The precedent defendant relies upon in support of its position is distinguishable. *Butts v. City of New York Dep't of Hous. Preservation and Dev.*, 990 F.2d 1397 (2d Cir.1993), for example, addressed the questions of whether the suit had been timely initiated after receipt of the right-to-sue letter and whether the plaintiff's Title VII claims were "reasonably related" to those alleged

in the EEOC charge. Defendant also cites to *Sedlak v. Lotto,* 1993 WL 117709 (Conn.Super.), where the trial court dismissed an individual defendant because he had not been named in the original EEOC complaint and right-to-sue letter.[3] These cases are factually and legally dissimilar from the case at bar, and in the Court's view do not support such an unduly harsh rule as urged by the defendant.

The failure to obtain a right-to-sue notice from the EEOC is not a fatal jurisdictional bar to suit; instead, it is only a precondition to bringing a Title VII action that can be waived by the parties or the court. *Pietras v. Board of Fire Commissioners of the Farmingville Fire District,* 180 F.3d 468 (2d Cir.1999). The Second Circuit excused the absence of the notice in *Pietras* because the plaintiff made diligent efforts to obtain one, but it was denied on the basis that she was not an employee. *Id.* at 474. While plaintiff has not presented any such justification in the present case, he indisputably exhausted the state procedures, and pursuant to the workshare agreement between the EEOC and the CCHRO, the EEOC normally adopts the finding of the state agency as its own. *See* Complaint, Ex. A. As the purposes of the exhaustion requirement—to provide notice to parties charged with violations and to facilitate voluntary compliance should the investigating agency find merit in the complaint, *see Maturo v. National Graphics,* 722 F.Supp. 916 (D.Conn.1989)—have been served by the state proceeding, the Court does not view the omission of the actual right-to-sue letter as grounds for dismissal.

### B. Statute of Limitations

■ Defendant also argues that the majority of plaintiff's claims are time-barred, as only incidents occurring 180 days before

---

**3.** It bears mentioning, although apparently not by defendant, that the trial judge in *Sedlak* later reversed that decision upon reconsideration, based on Second Circuit precedent holding that the "identity of interest" exception is appropriate in an action against a party not named in the EEOC complaint if the "underlying purposes of the [naming] requirement are otherwise satisfied." *Sedlak,* 1993 WL 338621 (Conn.Super.), *quoting Maturo v. National Graphics,* 722 F.Supp. 916, 925 (D.Conn.1989).

the CCHRO filing and 300 days before the EEOC filing are actionable under state and federal discrimination laws. The statutory requirement that charges be filed within 300 days of the alleged act of discrimination "is analogous to a statute of limitations, in that discriminatory incidents not timely brought before the EEOC will be time-barred once the plaintiff files suit in district court." *Hall v. South Central Connecticut Reg. Water Auth.,* 28 F.Supp.2d 76, 82 (D.Conn.1998). Under these timelines, only those incidents occurring on or after January 10, 1996 are actionable under Title VII, and on or after May 9, 1996 under the Connecticut Fair Employment Practices Act.

Plaintiff's complaint alleges a number of discriminatory acts over the duration of his eleven-year employment with Prudential, including his termination on May 10, 1996. In Mr. Ortiz' affidavit he relates discriminatory incidents "dating back to 6/84" that involved several of defendants' managers, including Al Percelli, Harry Varlarde, Robert DesRosier, Mark Farral, and Mike Amatrudo.[4] These individuals allegedly made racist and derogatory comments on Reporting Days and at required company meetings or, in the case of Mr. Amatrudo, discriminated against the plaintiff by failing to award him the "book" of a retiring agent despite his entitlement to it. Ortiz Aff. ¶¶ 2–4. Defendant has submitted an affidavit from the Prudential employee responsible for maintaining the field offices' databases, stating that she has reviewed the personnel files and data base information for these individuals. Trappler Aff. ¶ 3. According to Ms. Trappler, Varlarde has not worked at the New Haven office since January 1985, DeRosier not been a manager in the New Haven office since October 1986, Amatrudo only worked there between February 1989 and May 1991, Farrell served as a manger in the New Haven office from September 1991 until January 1994, and Pacelli (presumably, the "Al Percelli" referenced in the complaint) retired in 1988.

Given the departure dates of these individuals, which plaintiff does not challenge, any incidents at the New Haven district office involving them necessarily occurred before January 1996, and their conduct would thus not be actionable under Title VII or FEPA. Plaintiff argues that the "continuing violation" exception applies to toll the statute of limitations, allowing him to pursue his claims regarding these allegations. The Second Circuit has recognized that in certain situations, the time limits for filing complaints should be extended "where there is proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 766 (2d Cir. 1998). According to plaintiff, this exception applies because "all [the] unlawful actions culminated in the plaintiff's unlawful termination," citing to *Cornwell v. Robinson,* 23 F.3d 694 (2d Cir.1994). In that case, the continuing violation exception applied because the district court found that the defendant's personnel policies were gender discriminatory, and that the plaintiff "had suffered the same kinds of harassment at the hands of some of the same [co-workers], and under the aegis of some of the same supervisory personnel," despite plaintiff's numerous complaints. *Id.* at 704. The facts of that case also demonstrated that part of the reason for the delay in filing was plaintiff's three-year absence from work due to an illness precipitated by the harassment. *Id.* In contrast, the court in *Quinn* determined that a number of incidents occurring one or two years prior to the limitations period and involving different individuals were "sufficiently isolated in time (usually from each other, and at least from the timely allega-

---

**4.** There are numerous spelling discrepancies between plaintiff's affidavit and defendant's summary judgment submission (e.g. DeRosier and DesRosier), but the Court assumes that the individuals so named are one and the same.

tions) as to break the asserted continuum of discrimination" and were thus time-barred. *Quinn*, 159 F.3d at 766. Aside from plaintiff's assertion that the alleged discriminatory incidents "culminated" in his termination, he has not demonstrated any connection between them, nor has he presented any evidence from which the Court could conclude that Prudential allowed repeated and related instances of discrimination to occur unremedied. Mr. Ortiz' allegations are more analogous to those found to be isolated and dissimilar in *Quinn* than to the repeated pattern in *Cornwell,* and should not serve to suspend the time limits. As these allegations fall outside the limitations period, they are not actionable as violations of Title VII or the state anti-discrimination statute. As noted at oral argument, however, they may have evidentiary value related to plaintiff's remaining claims.

█ Plaintiff also brings a claim under 42 U.S.C. § 1981, which is governed by Connecticut's general three-year statute of limitations applicable to tort actions. *Holt v. KMI–Continental, Inc.,* 95 F.3d 123, 131 (2d Cir.1996). All of the above incidents would also be barred under that three-year period, as they would have occurred prior to October, 1994.

### C. Burden of Proof on Discrimination Claims

The familiar burden shifting analysis from *McDonnell Douglas* applies to plaintiff's claims. Under that test, Mr. Ortiz must first establish a prima facie case of discrimination by demonstrating membership in a protected class, satisfactory performance of his duties, adverse employment action, and circumstances giving rise to discrimination. *See Cruz v. Coach Stores,* 202 F.3d 560, 567 (2d Cir.2000). If he succeeds in this task, the burden then shifts to Prudential to produce a legitimate, non-discriminatory reason for his termination. If Prudential is able to do so, the burden returns to Mr. Ortiz to show that the company's stated reason is in fact a pretext for discrimination, or that discrimination was a motivating factor in the

decision to terminate his employment. *Fields v. New York State Office of Mental Retardation and Developmental Disabilities,* 115 F.3d 116, 120 (2d Cir.1997).

### 1. Plaintiff's Prima Facie Case

█ Defendant argues that summary judgment should enter on plaintiff's discrimination claims, as his opposition to its summary judgment motion does not disclose genuine issues of material fact warranting a trial. First, defendant contends that Mr. Ortiz has failed to make out a prima facie case, because he cannot demonstrate that he was performing his duties satisfactorily, or that his discharge occurred under circumstances giving rise to an inference of discrimination. Assuming arguendo that plaintiff can make out a prima facie case, defendant's argument continues, he is unable to demonstrate that Prudential's asserted nondiscriminatory reason for his termination—its belief that he violated the two job rule—is a pretextual cover-up for discrimination.

An employment discrimination plaintiff's burden in making out a prima facie case is *de minimis, McLee v. Chrysler Corp.,* 109 F.3d 130, 134 (2d Cir.1997), and while Mr. Ortiz' evidence is just that, the Court concludes that he has met this light burden. Defendant does not dispute Mr. Ortiz' membership in the protected group, and that an adverse job action was taken against him. Although Prudential contends that Mr. Ortiz' violation of the two job rule demonstrates that he was not performing satisfactorily, in the Court's view, this argument miscomprehends the nature of the inquiry under this prong, and renders the burden shifting analysis a circular exercise. As the Second Circuit stated more than 20 years ago, to require more than a showing that the plaintiff "possesses the basic skills necessary for the job ... unnecessarily collapses the steps suggested by *McDonnell Douglas* by shifting considerations which are more appropriate to the employer's rebuttal phase to the earlier requirement that the employee demonstrate competence to per-

form the specified work." *Powell v. Syracuse University*, 580 F.2d 1150, 1155 (2d Cir.1978). The Second Circuit more recently has reiterated its interpretation of the showing necessary to meet the second prong of the *McDonnell Douglas* test by stating "[t]o satisfy the second element of the test, the plaintiff need not demonstrate that his performance was flawless or superior. Rather, he need only demonstrate that he 'possesses the basic skills necessary for performance of [the] job.' " *de la Cruz v. New York City Human Resources Admin. DSS*, 82 F.3d 16, 20 (2d Cir.1996), quoting *Powell*, 580 F.2d at 1155.

Defendant has provided no evidence calling into question Mr. Ortiz' skills or abilities, and the duration of his employment at Prudential suggests that his performance as a sales agent at least met a base level of competence. Accordingly, the Court finds that Mr. Ortiz has met the second prong of his prima facie case. *See Visco v. Community Health Plan*, 957 F.Supp. 381 (N.D.N.Y.1997) (utilizing similar analysis to conclude that employee who allegedly violated company rules regarding personal calls nonetheless made out prima facie case because she had minimum qualifications for the position).

The Court also concludes that Mr. Ortiz has met the final prong of his prima facie case, in that he has provided evidence regarding the circumstances surrounding his termination from which an inference of discrimination could be drawn. In Mr. Ortiz' affidavit he names white agents who he claims were not terminated for violations of the two job rule, and makes specific allegations regarding their outside employment. For instance, Mr. Ortiz alleges that Mike Papale, a white sales agent, worked as a full-time coach for Albertus Magnus, and that Nick DeMaio, another white agent, worked as a bartender and at the Christmas Tree Shop in Orange, all with the knowledge of Spaziano, yet were not terminated. Ortiz Aff. ¶ 9. Evidence that a similarly situated employee not in the protected class was treated differently from the plaintiff allows for an inference of discrimination, thus meeting the final

prong of the prima facie case. *See Shumway v. United Parcel Service*, 118 F.3d 60 (2d Cir.1997).

## 2. Prudential's Legitimate, Non-Discriminatory Reason

■ The burden then shifts to Prudential to articulate a legitimate, non-discriminatory reason for terminating Mr. Ortiz. This burden on defendant is light, as it "need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Prudential has satisfied this burden by pointing to the two job rule, and the conclusion of violation based on that which was disclosed during the inspection of Mr. Ortiz' private office. Mr. Spaziano noted non-compliant business cards and Yellow Pages advertisements that identified Mr. Ortiz as a "Realtor" during the Private Office inspection, and given the previous warning issued to Mr. Ortiz regarding his real estate business, he forwarded the information to Mr. Sinha. Patricia Finnegan reviewed the documentary evidence, Mr. Ortiz' previous disciplinary history on the issue, and even made an independent telephone call, in response to which she was offered real estate and travel services. Finally, Mr. Spaziano's office also noted the violation of the private office rule requiring identification of the office as a Prudential office, and approval of clerical employees. All of these facts together, according to Finnegan, demonstrated a violation of the two job rule, and Prudential decided to terminate Mr. Ortiz' employment accordingly. As Prudential has proffered a legitimate, nondiscriminatory reason for Mr. Ortiz' termination, and has supported it with substantial documentary evidence, it has sufficiently rebutted the inference of discrimination created by the prima facie case.

### 3. Plaintiff's Evidence of Pretext

■ Once the presumption raised by the prima facie case is rebutted, the factual inquiry "proceeds to a new level of specificity." *Fisher v. Vassar College*, 114 F.3d 1332, 1336 (2d Cir.1997), *citing Burdine*, 450 U.S. at 255, 101 S.Ct. 1089. In response to defendant's legitimate, non-discriminatory reason, Mr. Ortiz is required to produce evidence from which a jury could infer that Prudential's reliance on the two job rule is pretextual, or that one of the factors motivating the decision to terminate him was discrimination. The Court finds that Mr. Ortiz has failed to create a jury question as to pretext, and summary judgment is therefore appropriate on his discrimination claim.

In an attempt to demonstrate pretext, Mr. Ortiz looks to his allegations regarding the racist and derogatory comments made by managers in the New Haven district office. In addition to the temporal distance between these comments and his termination, however, plaintiff has not linked any of these individuals to the investigation or decision to terminate his employment. It is undisputed that Al Spaziano conducted the private office visit and forwarded information to Raj Sinha, the then-Vice President, Regional Marketing; that Patricia Finnegan from Field Operations conducted the investigation and recommended his termination; and that Mr. Sinha's replacement, Luis Olerio, terminated Mr. Ortiz' employment. None of these individuals were alleged to have participated in the offensive and vulgar behavior described by plaintiff, nor is there any evidence that their judgment was somehow tainted by the racism of others. *See, e.g., James v. Newsweek*, 1999 WL 796173 (S.D.N.Y.) (Racist remarks insufficient to create issue of fact when made by individuals who played no role in adverse employment decision).

There is no suggestion, for instance, that any of the managers who made discriminatory comments were responsible for plaintiff's initial warning letter regarding the two job rule in March of 1995, such that an inference of discrimination could attach to the final termination decision that was based, in part, on that warning letter. As plaintiff has shown no link between the wrongdoers and the decision-makers, these allegations cannot be a basis for a finding that Prudential's stated reason for the termination is a cover-up for discrimination.

Plaintiff also attempts to show pretext by pointing to alleged discrepancies in how the reporting requirement was enforced. According to Mr. Ortiz, certain white agents had the "run of the office" and were not required to attend Reporting Days meetings on Tuesday and Friday mornings. Ortiz Aff. ¶ 7. In particular, Mr. Ortiz identifies Clemente Perotta, Louis Perelli, Michael Amatrudo and Douglas Harrigan. Ortiz Aff. ¶ 14. However, in his deposition Mr. Ortiz himself provided alternative, non-discriminatory explanations for the more favorable treatment Harrigan and Amatrudo received, noting that both individuals were "big producers" who would not be disciplined for Reporting Days violations because of the money they brought into the office. Ortiz Dep. 233–34, 241. Further, an employee in Prudential's Labor Relations department reviewed the personnel files for the New Haven district office, and submitted an affidavit stating that Spaziano had charged vacation days to Perrotta, Papale, and Perelli for failing to attend Reporting Days meetings in 1995 and early 1996. Alston Aff. ¶ 9.

Plaintiff responds that charging a vacation day cannot be considered discipline, because taking a vacation day is an agent's "right," but plaintiff's argument misunderstands the defendant's evidence on this point. The Alston affidavit makes clear that Perrotta, Papale and Perelli were disciplined through the loss of a day of vacation time, and plaintiff has pointed to no evidence permitting an inference that the discipline he received for his reporting days violations—written warnings—is more severe than that meted out to white agents. Finally, Ms. Delores Battle, cited in plaintiff's brief as a witness to the dis-

criminatory treatment of Reporting Days violations, stated in her deposition testimony that "[i]t was not a racial thing," but that generally the high producers in the former New Haven West district office were generally treated more favorably than the New Haven East sales agents, including Ortiz. Battle Dep. 42–43. As a reasonable jury could not find that defendant's reason for terminating Mr. Ortiz was discriminatory based on these alleged discrepancies in treatment, the allegations do not suffice to create a jury question.

■ Plaintiff's primary focus in his pretext argument, however, is on the two job rule violation itself. First, plaintiff disputes defendant's claim that he violated the two job rule at all. This argument is in part premised on Ortiz' interpretation of Article 26, which he claims prohibits only work that interferes with his Prudential employment during working hours, "between Monday–Friday, 9:00 am–5:00 p.m., 40 hours a week." To plaintiff, Article 26 contains an "implied exception" for work before 9:00 and after 5:00. Plaintiff has no evidence that this interpretation has ever been followed by defendants, and the plain language of Article 26 seems to contradict his reading of it, as it prohibits engaging in any work Monday through Friday "at any time," and does not speak in terms of hours. In the Court's view, plaintiff cannot successfully oppose a motion for summary judgment merely by arguing that the plain language of a policy, which he admits binds him, does not, in fact, prohibit what it says it prohibits. If plaintiff had any evidence that the policy had been interpreted or applied in different ways, or could point to specific situations in which the rule had been accorded a different meaning, he may have been able to demonstrate that applying it strictly in his case was an instance of differential treatment. But simply saying that the policy means thus, without any evidence in support, is similar to the "mere allegations or denials" that Rule 56(e) has designated as insufficient to oppose a summary judgment motion.

Plaintiff does claim in his affidavit that he did not market himself to the public "as a provider of Real estate services," Ortiz Aff. ¶ 17, and he submits three affidavits from real estate purchasers who declare that they utilized his services to purchase or list properties. The Rivera affidavits state that he only showed them the property they ultimately purchased on a Sunday afternoon, and did not attend the closing, while Pat Cestaro states that he only listed her property, and performed no other services. Affidavit of Raul Rivera [doc. # 52], Affidavit of Gloria Rivera [doc. # 53], Affidavit of Pat Cestaro [doc. # 51]. These affidavits, however, do not create disputes of fact as to whether defendant's articulated reason for Mr. Ortiz' termination was a pretext for discrimination. The private office visit checklist noted that Mr. Ortiz' business cards and advertisements identified himself to the public as a realtor, and that his telephone was answered in a manner that referred only to Ortiz Agencies, not to Prudential as required. The ensuing investigation looked to his previous warning, and his explanation then that his real estate business was for his "personal portfolio" only (which in fact the Rivera and Cestaro affidavits seem to contradict), and concluded that all the signs pointed to another violation of the two job rule. The fact that some of Mr. Ortiz' business may have been conducted on the weekends does not demonstrate defendant's conclusion was in error or unreasonable, much less that it masked discriminatory intent.

Mr. Ortiz also takes issue with a myriad of defendant's assertions regarding the facts that led them to conclude that he was violating the two job rule. For instance, Mr. Ortiz points out that he did have compliant Prudential business cards, and that the offending card cited by Mr. Spaziano in the private office visit was a separate card for him in his capacity as an officer of the Ortiz Insurance Agency, Inc. See Pl. 9(c)(2) Statement, p. 13. Def.Ex. 39, 42. In addition, Mr. Ortiz argues that Kim Jackson, the clerical employee who alerted

the district office to her presence by answering the telephone on December 7, 1995, *see* Def.Ex. 38, was in actuality an employee of the Ortiz Agency, Inc., thus rendering his noncompliance with Prudential's rules regarding the employment status of clerical assistants "irrelevant." Pl. 9(c)(2) Statement, ¶ 36. Plaintiff maintains that his reference to himself as a "realtor" on the Ortiz Agencies card and in his advertisements was primarily to "enhance his image" and to further his own personal investments. *Id.* at ¶ 30. These contentions, however, miss the point, because they do not get at the essential reason advanced by defendant for his termination: Prudential's belief, first raised at the private office inspection and developed through its investigation, that he was violating the two job rule as interpreted in Article 26. As explained above, despite plaintiff's interpretation to the contrary, the rule contains no exceptions for work in the evenings, or for work during the week for the purpose of increasing one's personal portfolio, or for work done under the aegis of a separate company, here the Ortiz Agency. Rather, the rule prohibits engaging in work "at any time" during the work week for "financial remuneration or profit." In the absence of any evidence that the rule has ever been interpreted or applied as Mr. Ortiz would have it, the Court will not adopt a reading contrary to the plain language of the rule, and then condemn the defendant's failure to enforce it in such a manner as discriminatory.

■ Further, to the extent Mr. Ortiz seeks to create disputes of fact from his flat denials of defendant's charges, his efforts are unavailing. A plaintiff cannot defeat a properly supported motion for summary judgment simply by denying the factual basis of defendant's asserted non-discriminatory reason without some additional evidence in support of his version of events that would allow the Court to infer that defendant really was not motivated by the reason it claims. To find otherwise would assure a jury trial in virtually every discrimination case, since a plaintiff would only have to deny the factual basis of

defendant's justification to defeat judgment at the Rule 56 stage. *See Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985) ("The summary judgment rule would be rendered sterile, however, if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion.") Plaintiff's denial of defendant's charges, in the absence of any supporting evidence, cannot on its own suffice to create material issues of fact warranting a trial.

■ Having rejected Mr. Ortiz' claims regarding his compliance with and interpretation of the two job rule, the Court turns to his arguments regarding similarly situated employees. In this regard the central thrust of plaintiff's opposition to defendant's summary judgment motion is his claim that white employees were disciplined more leniently for similar violations of the two job rule. As noted above, in his affidavit Mr. Ortiz alleges that two white sales agents, Papale and Demaio, engaged in outside employment, Papale as a coach at Albertus Magnus and Demaio as a bartender and an employee at the Christmas Tree Shop, with the full knowledge of the General Manager Al Spaziano. Ortiz Aff. ¶ 9. According to Ortiz, their differential treatment supports an inference of discrimination, because the two job rule was not enforced as stringently against white employees. *Id.* at ¶ 10.

A plaintiff in a discrimination action may establish that the reason articulated by a defendant for termination of plaintiff's employment is a pretext and that race, in fact, did play a part in the decision to terminate by proving that "similarly situated" white employees were treated more favorably than he. *Hargett v. National Westminster Bank,* 78 F.3d 836, 839 (2d Cir.1996). However, "to be similarly situated, the individuals with whom [a plaintiff] attempts to compare herself must be similarly situated in all material respects." *Shumway,* 118 F.3d at 64. More specifically, courts in this circuit have stated as follows:

"[e]mployees are not 'similarly situated' merely because their conduct might be analogized. Rather, in order to be similarly situated, other employees must have reported to the same supervisor as the plaintiff, must have been subject to the same standards governing performance evaluation and discipline, and must have engaged in conduct similar to the plaintiff's, without such differentiating or mitigating circumstances that would distinguish their conduct or the appropriate discipline for it."

*Francis v. Runyon*, 928 F.Supp. 195, 203 (E.D.N.Y.1996) (quoting *Mazzella v. RCA Global Communications, Inc.*, 642 F.Supp. 1531, 1547 (S.D.N.Y.1986)).

Even drawing all reasonable inferences in his favor, the Court concludes that Mr. Ortiz has not met this standard. In response to plaintiff's contention, defendant submitted an affidavit by an employee in the Labor Relations department, indicating that he was aware that a number of agents in the New Haven district office were investigated and disciplined for violations of the two job rule at approximately the same time as Mr. Ortiz. Alston Aff. ¶ 5. Specifically, he states that a Joseph Paiva was terminated for violating the two job rule in January of 1995; David Young received a warning letter for the same infraction on May 8, 1995 and resigned soon after; Nicholas Demaio was verbally warned regarding his employment at the Christmas Tree Shop from 11:00 p.m. on Friday until 7:00 a.m. Saturday morning (a one-hour violation), and retired soon after; Michael Papale was warned on March 18, 1996 regarding his job as a basketball coach for Albertus Magnus, and was terminated on February 21, 1997 for his repeated violations of the two job rule; and Larry Brownstein was investigated in 1996 for a possible two job violation after he amended his Form U–4 to reflect that he was an agent of Valley Forge Life.

According to Alston, the investigation into Brownstein's relationship with Valley Forge disclosed that his work for that insurance agency fit into the sole express exception to the two job rule, allowing work for another insurance company "when an application for an individual life or health insurance policy or an individual annuity has been submitted to the Prudential, and the Prudential, having received all the information necessary for consideration of the application, has declined to issue the policy applied for or to issue an alternative kind of policy in any amount or on any basis . . . ." Prudential therefore concluded that Brownstein had not violated the two job rule. Alston Aff. ¶ 6.

This showing by defendant rebuts Mr. Ortiz' contention that similarly situated white employees were treated differently than he. First, the only other employee who had the same disciplinary record as Mr. Ortiz—that is, a warning and a subsequent violation of the two job rule—was Mr. Papale, who received the identical discipline as Mr. Ortiz. Further, other employees had been terminated for two job rule violations, both before (Paiva) and after (Papale) the investigation into Mr. Ortiz' second violation, seriously undermining his claim that due to his race, his treatment was unduly harsh. Finally, the specific details explained in defendants' submission demonstrates that other white employees were not similar "in all material respects" to Mr. Ortiz. The relatively trivial nature of Demaio's one-hour violation renders him dissimilar to Mr. Ortiz, and explains any differences in their treatment. The detailed explanation regarding Brownstein's affiliation with Valley Forge also distinguishes him from Mr. Ortiz, as Prudential determined that he fit within an exception explicitly set out in Article 26, as compared to the "implied" exception Mr. Ortiz contends exists.

The Alston affidavit effectively disposes of plaintiff's contention that similarly situated white employees were treated more favorably. Plaintiff attempts to resuscitate this argument by chiseling at what he perceives as chinks in Prudential's defense. First, Mr. Ortiz sees significance in the fact that Young and Demaio resigned or retired, rather than being terminated, and

argues that this demonstrates disparate treatment. It appears from the Alston affidavit, however, that Demaio and Young had not been disciplined previously for the same violation, thus meriting the lower level disciplinary action of a warning. Second, he contends that Mr. Paiva was Portuguese, rather than white, and that this disqualifies him as a comparator for the purposes of assessing the non-discriminatory nature of defendant's conduct. Even excluding Mr. Paiva, however, the Court is persuaded that the evidence submitted by defendant sufficiently rebuts Mr. Ortiz' allegations such that a jury trial on the issue is not necessary.[5]

Mr. Ortiz focuses on the defendant's claims regarding Brownstein, alleging that he was in "pure violation of the two-job rule" because "[t]here is no proof whatsoever that Mr. Brownstein substantiated each and every application for individual life or health insurance policy or annuity through Prudential." Ortiz Aff. ¶ 12. While this is true, more importantly plaintiff offers no proof that Brownstein is similarly situated, such that his violation of the two job rule would be of any relevance. When stripped of the hyperbole, the core of plaintiff's argument is disbelief of defendant's explanation, because "there is no way that Prudential will reject a life-insurance policy application and the said life insurance policy application be acceptable to Valley Forge." Ortiz Aff. ¶ 12. Without any evidence of this claimed similarity of underwriting standards, however, or any additional evidence demonstrating that Mr. Brownstein is sufficiently similar to Mr. Ortiz to be a legitimate comparator, plaintiff's unsupported declaration regarding his treatment does not raise factual issues as to whether white agents were treated more leniently with regard to two job rule violations.

Further, Mr. Ortiz' only evidence that similarly situated white employees were treated differently is his affidavit assertion that it is so. While there is no requirement under Rule 56 or in Title VII jurisprudence that a plaintiff provide more evidence than his own affidavit in order to survive summary judgment, *Danzer v. Norden Systems*, 151 F.3d 50 (2d Cir. 1998), in the face of the specifics provided by defendant regarding the white employees he identified, he must come forward with some evidence that would support a jury's determination in his favor. Plaintiff could have submitted documentation from similarly situated employees' personnel files, or affidavits from other individuals stating their personal knowledge of the facts that plaintiff asserts, with little explanation of the source of his knowledge. Even drawing all reasonable inferences from the record in plaintiff's favor, he has not put forth sufficient evidence to merit a jury trial. *See Henry v. Daytop Village*, 42 F.3d 89, 97 (2d Cir.1994) (Granting summary judgment in discrimination claim alleging, in part, that discipline meted out to African–American female employee was disproportionately harsh, because employee failed to corroborate her allegation that ten white or male employees received favorable treatment for similar infractions, and failed to present evidence beyond unsubstantiated statements that ·those ten employees were similarly situated.)

For the reasons outlined above, plaintiff is not entitled to a jury trial on his claim of discriminatory termination, because he has not presented any evidence to allow a reasonable juror to infer that the reasons Prudential gave for his termination were pretextual, or that discrimination was a motivating factor in its decision. Accord-

---

5. Plaintiff also contends that Papale was terminated after his case was initiated, and thus he cannot serve as a legitimate comparator, presumably because defendant may have terminated Papale simply as a defensive maneuver in the suit. Aside from the fact that Papale received his warning prior to Mr. Or-

tiz' termination, plaintiff has not directed the Court to any authority supporting the proposition that terminations occurring after the instigation of a discrimination suit are irrelevant to the "similarly situated" inquiry, nor has the Court been able to locate any such authority.

ingly, defendant's motion for summary judgment is granted.

### D. Preemption of Plaintiff's State Law Claims

██ Plaintiff also brings claims for intentional infliction of emotional distress (Fourth Count), breach of an implied contract (Fifth Count), breach of the covenant of good faith and fair dealing (Sixth Count), and wrongful termination (Seventh Count). Plaintiff's complaint makes clear that counts five through seven all relate to defendant's reason for terminating his employment, and the procedures they employed in doing so. *See, e.g.* Fifth Count, ¶ 17 (reasons given for plaintiff's discharge were "specious, false, pretextual and without cause or reason"), ¶ 18 (in terminating plaintiff "defendant violated its own procedures governing the discharge of one of its employees"), ¶ 19 (defendant breached its implied contract of employment with plaintiff); Sixth Count, ¶ 17 (defendant's actions in terminating plaintiff "without cause for specious false and pretextual reasons, and in violation of their own procedure" constituted breach of the covenant of good faith and fair dealing); and Seventh Count, ¶ 17 (plaintiff's termination was without "just cause or reason"). Defendant argues that all state law claims are preempted by § 301 of the LMRA.

That statute provides in pertinent part as follows:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185. The Supreme Court has held that when resolution of a state-law claim is substantially dependent upon analysis of the terms of the agreement between parties to a labor contract, the claim must be treated as a § 301 claim or be dismissed as preempted by federal labor law, in order to promote uniformity and encourage utilization of the collectively bargained procedures. *Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 220, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985); *Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 403, 108 S.Ct. 1877, 100 L.Ed.2d 410, (1988).

A number of district courts in this state have concluded that similar state law claims are preempted under this doctrine. *See Kellman v. Yale–New Haven Hospital,* 64 F.Supp.2d 35 (D.Conn.1999) (dismissing claims of negligent and intentional infliction of emotional distress); *Anderson v. Coca Cola Bottling,* 772 F.Supp. 77, 80 (D.Conn.1991) (granting summary judgment on § 301 grounds on breach of contract, breach of implied covenant of good faith and fair dealing, intentional infliction and wrongful discharge); *Knight v. Southern New England Tel. Corp.,* 1998 U.S.Dist.LEXIS 15952 (D.Conn.1998) (claims for emotional distress, breach of contract and breach of implied covenant of good faith and fair dealing preempted). Resolving the state law claims made in the Fifth through the Seventh Counts would be substantially dependent upon an analysis of the collective bargaining agreement, as the language of the complaint makes clear, because the Court would not only be required to determine whether Prudential had just cause under the collective bargaining agreement for Mr. Ortiz' termination, but would also have to interpret the terms of Article 26. These determinations are solely for an arbitrator selected by the parties to the contract, and the Court thus dismisses these claims.

██ Although the preemptive effect of § 301 is broad, the Supreme Court "has been careful to note that section § 301 does not preempt state law claims that simply require courts to consider the same factual issues that would be raised by claims under a collective bargaining agreement." *Claps v. Moliterno Stone Sales, Inc.,* 819 F.Supp. 141 (D.Conn.1993) (emphasis in original) (citing *Lingle v. Norge Division of Magic Chef, Inc.,* 486 U.S. 399,

409, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988) (emphasis in original)). In *Lingle,* the Supreme Court stated that § 301 preemption merely ensures that federal law will be the basis for interpreting collective bargaining agreements, and says nothing about the substantive rights a State may provide to workers when adjudication of those rights does not depend upon the interpretation of such agreements. Therefore even if an arbitration under the collective bargaining agreement, on the one hand, and litigation of a state law claim premised on a substantive state right, on the other, would require addressing precisely the same set of facts, as long as resolution of the state claim can be had without interpreting the agreement itself, the claim is "independent" of the agreement for § 301 preemption purposes. Id. at 409–10, 108 S.Ct. 1877.

The Fourth Count of Mr. Ortiz' complaint alleges that the defendant's conduct was extreme and outrageous, and created an unreasonable risk of causing great emotional distress to the plaintiff. Mr. Ortiz does not seek to recover for emotional distress stemming from Prudential's violation of the collective bargaining agreement; rather, the plaintiff's claim is based upon rights wholly separate from the agreement between Prudential and the union. *See Bimler v. Stop & Shop,* 965 F.Supp. 292 (D.Conn.1997) (finding claims for negligent and intentional infliction of emotional distress not preempted). Deciding whether the defendant's conduct met this standard does not require the Court to determine whether Prudential's actions were within or exceeded the bounds of the collective bargaining agreement. *See Dulay v. United Technologies Corporation,* 1994 WL 362149 (D.Conn.1994) (same). Because resolution of this claim is not substantially dependent on the terms of the collective bargaining agreement, it is not preempted.

█ Given this Court's resolution of plaintiff's discrimination claims, however, his state law claim for intentional infliction is the sole claim remaining in this case.

Pursuant to 28 U.S.C. § 1367(c), "district courts may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction." *See also Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 357, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988). While the district court has the discretion to retain jurisdiction, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendant jurisdiction doctrine—judicial economy, convenience, fairness and comity—will point toward declining jurisdiction over the remaining state-law claims." *In re Merrill Lynch Ltd. Partnerships Litig.,* 154 F.3d 56, 61 (2d Cir.1998) (quoting *Carnegie–Mellon Univ.,* 484 U.S. at 350 n. 7, 108 S.Ct. 614). In consideration of these factors, the Court declines to exercise supplemental jurisdiction over the Fourth Count of the complaint.

## IV. CONCLUSION

As Mr. Ortiz has failed to demonstrate material issues of disputed fact on his discrimination claim, and as three of his remaining state law claims are preempted by § 301 of the LMRA, Defendant's Motion for Summary Judgment [doc. # 38] is GRANTED.

The Court declines to assert supplemental jurisdiction over Mr. Ortiz' remaining claim, and therefore the Clerk is directed to close this case.

IT IS SO ORDERED.