344 Conn. 603 SEPTEMBER, 2022 603

Board of Education *v.* Commission on Human Rights & Opportunities

BOARD OF EDUCATION OF THE CITY OF NEW
HAVEN *v.* COMMISSION ON HUMAN
RIGHTS & OPPORTUNITIES
ET AL.
(SC 20696)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Kahn, Ecker and Keller, Js.

*Syllabus*

Pursuant to statute (§ 46a-58 (a)), "[i]t shall be a discriminatory practice . . . for any person to subject . . . any other person to the deprivation of any rights, privileges or immunities, secured or protected by the . . . laws of this state or of the United States, on account of . . . mental disability [or] physical disability . . . ."

Pursuant further to statute (§ 46a-64 (a) (1)), "[i]t shall be a discriminatory practice . . . [t]o deny any person within the jurisdiction of this state full and equal accommodations in any place of public accommodation . . . because of . . . intellectual disability [or] mental disability . . . ."

The defendant M filed a complaint with the named defendant, the Commission on Human Rights and Opportunities, on behalf of his minor child, A, alleging that the plaintiff board of education had discriminated against A on the basis of A's mental disability. A, who had been diagnosed with several mental and cognitive disorders, attended a public magnet school, where he initially was enrolled as a special education student who was entitled to an individualized education plan and special accommodation services under the Individuals with Disabilities Education Act (IDEA) (20 U.S.C. § 1400 et seq.). The school subsequently determined, against the wishes of A's parents, that A would no longer be designated as a special education student under the IDEA. Thereafter, A sustained a concussion during an incident at school, and A's parents kept A out of school until he was symptom free on the basis of the recommendation of A's physician. During A's absence, the board sent a habitual truancy notice to A's parents and held a planning and placement team meeting, which was attended by M and various representatives of the board, among other individuals, to discuss A's eligibility for special education services. At that meeting, M attempted to offer a letter from A's physician regarding A's post-concussion syndrome, but the board declined to accept it because it was purportedly illegible and undated. Immediately thereafter, a representative of the board initiated A's withdrawal from the magnet school. M alleged in his complaint that the board had discriminated against A in violation of § 46a-64 (a) (1) and the Americans with Disabilities Act of 1990 (ADA) (42 U.S.C. § 12101 et seq.), as enforced by § 46a-58 (a). After a hearing before the commission, a human rights

Board of Education *v.* Commission on Human Rights & Opportunities

referee concluded, inter alia, that a public school is a place of public accommodation for purposes of § 46a-64 and that the board unlawfully had discriminated against A by withdrawing him from school on the basis of his disability. The board filed an administrative appeal with the trial court, which remanded the case for a determination of whether the board had violated the ADA. On remand, the board claimed that the complaint was actually seeking relief for the denial of a free and appropriate public education under the IDEA and that M had failed to exhaust his administrative remedies for an IDEA violation before seeking relief pursuant to the ADA. The referee noted that the board had not raised that claim previously but concluded that M's complaint did not raise a free and appropriate education claim. The referee also concluded that A was physically disabled under the ADA due to his post-concussion syndrome and that the board had violated § 46a-58 (a) by unilaterally withdrawing him from school on the basis of that disability. The trial court upheld the decision of the referee. The court rejected the board's claims that the commission lacked subject matter jurisdiction to adjudicate claims brought pursuant to the ADA and that it lacked jurisdiction over M's complaint on the ground that M failed to exhaust his remedies pursuant to the IDEA. The court also declined to consider the board's claim that the referee incorrectly determined that a public school is a place of public accommodation because the board did not raise that issue before the referee. The trial court rendered judgment dismissing the board's appeal, from which the board appealed. *Held*:

1. The board could not prevail on its claim that the trial court incorrectly determined that the commission had subject matter jurisdiction to adjudicate the claim that the board violated the ADA and to identify ADA violations for purposes of determining whether § 46a-58 (a) had been violated; the board conceded at oral argument before this court that its claim was controlled by this court's recent conclusion in *Connecticut Judicial Branch* v. *Gilbert* (343 Conn. 90), made in the context of a discrimination claim predicated on a violation of Title VII of the Civil Rights Act of 1964, as amended by Title VII of the Civil Rights Act of 1991 (42 U.S.C. § 2000e et seq.), that the language of § 46a-58 (a) unambiguously confers on the commission the authority to identify violations of federal civil rights laws for the purpose of determining whether state law has been violated and that, when the commission finds a violation of federal antidiscrimination law as a factual predicate to a violation of § 46a-58 (a), it does so as a matter of state law.

2. The trial court correctly determined that M was not required to exhaust his administrative remedies before filing the complaint with the commission on A's behalf: although the board failed to raise the exhaustion issue in the proceedings before the referee, that claim implicated the commission's subject matter jurisdiction, an issue that could be raised at any time, and, therefore, that issue properly was before the trial court and this court; moreover, although a party is required to exhaust his or

Board of Education *v.* Commission on Human Rights & Opportunities

her available administrative remedies provided by state law (§ 10-76h) before he or she may file a civil action seeking relief for the denial of a free and appropriate public education, M's complaint did not seek such relief, as the claims therein could have been brought outside of the school setting, and the fact that A was unable to take advantage of the educational services at the magnet school as a result of the board's unilateral actions did not convert M's claim for discrimination on the basis of A's disability into a claim for a denial of a free and appropriate education; furthermore, the history of the proceedings in the present case bolstered this court's conclusion that the complaint did not seek relief for the denial of a free and appropriate education, as A's parents never invoked formal procedures pursuant to § 10-76h, they did not ask the referee during the proceedings on the complaint to order the board to reenroll A at the magnet school, to designate him as a special education student, or to provide him with appropriate educational services, and there was no reason to believe that they wanted or would be entitled to such relief in light of the fact that A had since been enrolled in a school in another district, where he was receiving a free and appropriate education.

3. The board's claim that the referee incorrectly determined that a public school is a place of public accommodation pursuant to § 46a-64 did not implicate the commission's subject matter jurisdiction and, therefore, was not reviewable: contrary to the board's contention that its claim could be raised at any time because it implicated the board's subject matter jurisdiction, the claim regarding the proper interpretation of the phrase "place of public accommodation" alleged that the commission had failed to establish an element of a statutory remedy, which implicated the commission's statutory authority and the legal sufficiency of the complaint, not the commission's jurisdiction, and, in the present case, the claim that M raised in his complaint, that the board had violated § 46a-64 by discriminating against A on the basis of his disabilities in a place of public accommodation, was within the class of claims that the commission has authority or competence to decide.

Argued April 27—officially released September 6, 2022

*Procedural History*

Appeal from the decision of the human rights referee for the named defendant, the Commission on Human Rights and Opportunities, awarding damages to the claimant in an action alleging discrimination by the plaintiff, brought to the Superior Court in the judicial district of New Britain, where the court, *Cohn, J.*, rendered judgment dismissing the appeal, from which the plaintiff appealed. *Affirmed*.

Board of Education *v.* Commission on Human Rights & Opportunities

*Proloy K. Das*, with whom was *Emily McDonough Souza*, for the appellant (plaintiff).

*Michael E. Roberts*, human rights attorney, with whom was *Megan K. Grant*, human rights attorney, for the appellee (named defendant).

*Opinion*

KAHN, J. A was a student with disabilities enrolled in the John C. Daniels Interdistrict Magnet School of International Communication (John Daniels), a public school located in New Haven. His father, M, filed a complaint with the named defendant, the Commission on Human Rights and Opportunities (commission), alleging that the plaintiff, the Board of Education of the City of New Haven (board), had discriminated against A on the basis of his disabilities by unilaterally withdrawing him from the school. A human rights referee concluded that the board had discriminated against A on the basis of his disabilities and awarded damages of $25,000. The board appealed to the trial court, which dismissed the appeal. The board then filed this appeal,[1] claiming that the trial court incorrectly determined that (1) the commission had subject matter jurisdiction to adjudicate A's claim, pursuant to General Statutes § 46a-58 (a),[2] that the board had violated the Americans with

[1] The board appealed to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2.

[2] General Statutes § 46a-58 (a) provides: "It shall be a discriminatory practice in violation of this section for any person to subject, or cause to be subjected, any other person to the deprivation of any rights, privileges or immunities, secured or protected by the Constitution or laws of this state or of the United States, on account of religion, national origin, alienage, color, race, sex, gender identity or expression, sexual orientation, blindness, mental disability, physical disability or status as a veteran."

Although § 46a-58 (a) was the subject of amendments in 2017; see Public Acts 2017, No. 17-127, § 2; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of § 46a-58.

Board of Education *v.* Commission on Human Rights & Opportunities

Disabilities Act of 1990 (ADA), 42 U.S.C. § 12101 et seq.; (2) the commission had subject matter jurisdiction over A's claims when M failed to exhaust his administrative remedies pursuant to the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 et seq.; and (3) the issue of whether the referee had incorrectly concluded that a public school is a place of public accommodation for purposes of General Statutes § 46a-64 (a)[3] was not reviewable. We reject the first two claims and conclude that the third claim is not reviewable. Accordingly, we affirm the trial court's judgment.

The record reveals the following facts that were found by the commission or that are undisputed. In February, 2010, M submitted an application for A to attend kindergarten at John Daniels. John Daniels is open to all state residents, and admission is determined by a lottery system. See General Statutes § 10-66bb (d) (8) (D) ("if there is not space available for all students seeking enrollment" in public charter school, "the school may give preference to siblings but shall otherwise determine enrollment by a lottery").

A was diagnosed with several mental and cognitive disorders, including Asperger's syndrome, childhood disintegrative disorder, attention deficit and hyperactivity disorder and "anxiety [disorder not otherwise speci-

---

[3] General Statutes § 46a-64 (a) provides in relevant part: "It shall be a discriminatory practice in violation of this section: (1) To deny any person within the jurisdiction of this state full and equal accommodations in any place of public accommodation, resort or amusement because of race, creed, color, national origin, ancestry, sex, gender identity or expression, marital status, age, lawful source of income, intellectual disability, mental disability, physical disability, including, but not limited to, blindness or deafness, or status as a veteran, of the applicant, subject only to the conditions and limitations established by law and applicable alike to all persons . . . ."

Although § 46a-64 (a) was the subject of amendments in 2017; see Public Acts 2017, No. 17-127, § 5; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of § 46a-64.

Board of Education *v.* Commission on Human Rights & Opportunities

fied].'' As the result of these disorders, A had difficulty coping with large groups of children and with overstimulating or chaotic environments. His symptoms included ''inconsistent regression in normal development, poor social skills, sensory issues, difficulty managing feelings, auditory and visual hallucinations, challenges with concentration and focus, poor processing skills and difficulty with transitions.'' A also physically manifested these disorders in a variety of ways, including shaking his hands up and down, making unusual facial expressions and using distorted speech.

A was accepted as a student at John Daniels and began attending in September, 2010. Because of his various disorders, A was enrolled as a special education student entitled under the IDEA to an individualized education plan and special accommodation services. Between September, 2010, and March, 2011, A's parents sought and received a number of accommodations for him, including transportation to and from school on a smaller school bus and an additional snack during the school day.

On September 16, 2010, M sent an email to the principal of John Daniels, Gina Wells, in which he thanked her for informing him about the ''buddy'' who had been assigned to A and indicating that, if Wells had provided the information earlier, much confusion and misunderstanding could have been avoided. Wells forwarded the email to the assistant principal, Marlene Baldizon, with the comment, ''I will not be able to contain myself much longer—you may have to take over, Marlene.'' In November, 2010, the school determined, against the wishes of A's parents, that A would no longer be designated as a special education student but would be subject to a ''§ 504'' plan.[4]

---

[4] Section 504 of the Rehabilitation Act of 1973; see Pub. L. No. 93-112, § 504, 87 Stat. 355, 394; as amended, provides in relevant part: ''No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be

Board of Education *v.* Commission on Human Rights & Opportunities

On March 29, 2011, A was injured at school when another child pulled on his clothing and he fell. A's mother took him to the emergency department at Yale New Haven Hospital, where it was determined that he had suffered a concussion. Upon his discharge, A's parents were given a "return to school certificate," indicating that he could return to school when he was symptom free for twenty-four hours. In the days following his injury, A continued to have symptoms, including disorientation, malaise and headaches. A's parents spoke to his primary care physician, who recommended that he stay at home until he was symptom free.

When A failed to return to school, Wells and the board's truancy department made several phone calls to his parents. On April 8, 2011, the board requested a "student absence inquiry" report, which indicated that, during the school year, A had had sixteen excused absences and ten unexcused absences. Eight of the unexcused absences occurred after A's injury. After obtaining the report, the board sent a habitual truancy notice to A's parents, which indicated that a copy of the notice would be sent to court. M retained an attorney, Patricia Kaplan, to represent him in the truancy proceeding.

Meanwhile, A's parents had requested a planning and placement team meeting to discuss whether A was eligible for special education services. On April 8, 2011, Lou

denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794 (a) (2018).

For students with special disabilities that require special instruction, the IDEA controls the procedural requirements, and an individualized educational plan is developed. See *K.E.* v. *Northern Highlands Regional Board of Education*, Docket No. CV-18-12617 (KM) (SCM), 2019 WL 5617788, *2–3 (D.N.J. October 30, 2019), vacated on other grounds, 840 F. Appx. 705 (3d Cir. 2020). For students with disabilities who do not require specialized instruction, a "§ 504 plan" may be created to outline specific accessibility requirements. See id., *2 n.2.

Board of Education *v.* Commission on Human Rights & Opportunities

Faiella, a certified legal intern with the Quinnipiac Law School legal clinic, which represented A and his parents, sent an email to Kathleen Cassell, a board administrator, requesting that the meeting be cancelled because A's parents had decided that "this [was] not the route that they would like to take at this time."[5] On April 13, 2011, Amy Vatner, an advocate with African Caribbean American Parents of Children with Disabilities, sent an email to Wells and Maralyn Klatzkin, a special education teacher, indicating that A's parents would be filing a request for mediation with the state Department of Education. Wells forwarded the email to Baldizon, stating in her email that "this is the student who lives in West Haven and went to the mayor. The mayor has never heard about the student. Anyway, who responds to this? He is a magnet student from West Haven who has been absent over [thirty] days this year. Quite honestly, I think that we should withdraw him from New Haven schools." On April 14, 2011, a request for a mediation to discuss A's eligibility for special education and for an alternative educational placement in light of his concussion was submitted to the state Department of Education's Bureau of Special Education.

A planning and placement team meeting took place at the office of the board's superintendent on May 5, 2011. M, Cassell, Klatzkin, Lorna Link, a school psychologist, Kasey Masa, a teacher, Donna Kosiorowski, a nurse and § 504 coordinator, Michelle Laubin, attorney for the board, Wells, Virginia Bauer, assistant director

---

[5] Although Faiella's note used the word "cancel," M testified at the hearing before the human rights referee that he had asked for a postponement of the planning and placement team meeting so that the meeting could take place at the board's office instead of at John Daniels. He also testified that he had not asked that the meeting be cancelled, and he and A's mother were still interested in having A designated as a special education student. The respective roles of Kaplan and Faiella with respect to providing legal representation to A and his family are not entirely clear from the record.

Board of Education *v.* Commission on Human Rights & Opportunities

of West Haven[6] pupil services, Typhanie Jackson, the board's director of student services, and Vatner attended the meeting. M indicated that he was concerned that A was no longer designated as a special education student and, therefore, was no longer entitled to an individualized education plan. He also stated that A would not be returning to school until he was cleared to do so by his physicians and expressed an interest in obtaining homebound services for A. When M was questioned about A's continued absence from school, he attempted to present a handwritten letter from A's physician regarding his medical status and his diagnosis of post-concussion syndrome. The board declined to accept the letter because, according to the planning and placement team, it was illegible, undated, and not on the physician's letterhead. Upon leaving the meeting, M understood that he needed to obtain another letter from A's physician and that A would return to John Daniels as soon as his physicians medically cleared him.

Immediately after the meeting, however, Jackson, acting on behalf of the New Haven board, obtained a form for withdrawal from John Daniels, filled it out with A's information and signed it. Although the form had signature lines for the parents of the withdrawing student, neither of A's parents was asked to sign it. The board did not notify A's parents that he had been withdrawn.

On May 16, 2011, A's physician prepared a typewritten note indicating that A was still having symptoms from his concussion and recommending that he return to school at the beginning of the next school year. M faxed

___

[6] A and his parents lived in West Haven up until May, 2011, at which time they moved to New Haven. The board's superintendent testified at the hearing before the human rights referee that, when a special education student from a district other than New Haven attends John Daniels, the district in which the student resides coordinates the student's special educational services.

Board of Education *v.* Commission on Human Rights & Opportunities

the note to Kaplan, who forwarded it to John Daniels on or about June 2, 2011.

Later in June, 2011, M learned that A had been withdrawn from John Daniels when he stopped by the board's office and an unidentified woman informed him of the withdrawal. He also was shown a copy of the withdrawal form at that time. After speaking to Jackson about the withdrawal and questioning her about its legality, it appeared to him that the board was not going to allow A to return to John Daniels. Because A's parents believed that A would not be allowed to return to John Daniels, and because they were uncertain at the time whether they would still be living in New Haven; see footnote 6 of this opinion; or, instead, would be living in West Haven during the following school year, they requested a residency hearing to determine what school A would be attending. It was ultimately determined that A was a West Haven resident and would attend Edith E. Mackrill Elementary School (Mackrill School) in West Haven.[7] A started attending first grade at Mackrill School that fall.

On November 1, 2011, M filed a complaint with the commission alleging that the board had engaged in unlawful discrimination on the basis of mental disability when it withdrew A from John Daniels. On October 4, 2013, M filed an amended complaint, alleging, inter alia, that the board had discriminated against A in violation of § 46a-64 and the ADA, as "enforced through . . . § 46a-58 (a)." After assessing the complaint pursuant to General Statutes § 46a-83 (c) (2), the commission ordered a public hearing before a human rights referee.

Will Clark, the board's chief operating officer, testified at the hearing before the human rights referee that the board did not have a policy in 2011 of withdrawing

_____

[7] The human rights referee did not indicate the basis for the finding that A was a West Haven resident.

Board of Education *v.* Commission on Human Rights & Opportunities

students for habitual truancy. Jackson testified that a child never would be withdrawn from school on the basis of a medical condition. She further testified that a child who was receiving homebound services would not be withdrawn.[8]

The human rights referee concluded that a public school is a place of public accommodation for purposes of § 46a-64, that A suffered from a mental disability, as defined in General Statutes § 46a-51 (20), and that his post-concussion symptoms were either a physical disability as defined in § 46a-51 (15), or were perceived to be one. She further concluded that the board unlawfully had discriminated against A when it unilaterally withdrew him from John Daniels. She ordered the board to pay damages for emotional distress in the amount of $25,000, to remove the notation of habitual truancy from A's school records, to cease and desist from all acts of discrimination, and to ensure that the board and its employees would not retaliate against A or his family.

The board appealed from the referee's ruling to the trial court. After hearing oral arguments, the trial court remanded the matter to the human rights referee for a determination of whether the board had violated the ADA.[9] On remand, the board claimed that, because the complaint was actually seeking relief for the denial of a free and appropriate education (FAPE) under the IDEA, M was required to exhaust his remedies for an IDEA violation before he could seek relief pursuant to

---

[8] Jackson also testified that M specifically had requested at the planning and placement team meeting that A be withdrawn from school. The human rights referee discredited that testimony, stating that it "was not corroborated; nor did it comport with facts and circumstances leading up to the withdrawal."

[9] The trial court noted in the remand order that the parties agreed at oral argument that the human rights referee had determined that the board violated § 46a-64 by discriminating against A in a place of public accommodation but that she had made no specific ruling as to whether the board violated the ADA for purposes of A's claim pursuant to § 46a-58.

Board of Education *v.* Commission on Human Rights & Opportunities

the ADA. In her articulation, the human rights referee noted that the board had not raised that claim previously, and the trial court had not requested that she address the issue in the remand order. Nevertheless, the referee concluded that the complaint did not raise "a FAPE claim." The referee further noted that, to the extent that the claim was properly before her, the exhaustion requirement was excused because the board had not advised A of his rights under the IDEA.[10] The referee then concluded that A was physically disabled under the ADA as a result of his post-concussion syndrome and that the board had unilaterally withdrawn him from John Daniels on the basis of that disability, in violation of § 46a-58 (a). Accordingly, A was entitled to damages pursuant to General Statutes § 46a-86 (c).

The trial court upheld the decision of the human rights referee. With respect to the board's claim that the commission had no jurisdiction over A's claim because he failed to exhaust his remedies pursuant to the IDEA, the court concluded that there was no exhaustion requirement because the claim raised in the complaint was properly characterized as a claim of discrimination on the basis of physical disability, not a claim for a FAPE. The court also rejected the board's claim that the commission had no jurisdiction to adjudicate claims pursuant to the ADA. The court declined to consider the board's claim that that the human rights referee had incorrectly determined that a public school is a place of public accommodation because the board did not raise that issue in the proceedings before the referee. After considering the board's other claims, the

_____

[10] The human rights referee cited *Quackenbush* v. *Johnson City School District*, 716 F.2d 141, 147 (2d Cir. 1983), cert. denied, 465 U.S. 1071, 104 S. Ct. 1426, 79 L. Ed. 2d 750 (1984), in support of this proposition. We express no opinion as to whether this reading of *Quackenbush* is correct, as it has no bearing on our analysis.

Board of Education *v.* Commission on Human Rights & Opportunities

trial court concluded that they were without merit and dismissed the appeal.[11]

This appeal followed. The board claims on appeal that the trial court incorrectly determined that the commission had subject matter jurisdiction to adjudicate the claim that the board violated the ADA and that M was not required to exhaust his administrative remedies pursuant to the IDEA before he could bring his claims pursuant to §§ 46a-58 (a) and 46a-64 (a). The board further contends that the trial court should have addressed its unpreserved claim that a public school is not a place of public accommodation for purposes of § 46a-64 (a) because the claim implicates the commission's subject matter jurisdiction, and the human rights referee incorrectly determined that John Daniels is a place of public accommodation.

I

We first address the board's claim that the trial court incorrectly determined that the commission had subject matter jurisdiction to adjudicate the claim that the board violated the ADA. In support of this claim, the board makes two arguments. First, it contends that, to the extent that the commission has been designated as a "deferral agency" under federal law with the authority to adjudicate ADA claims, its authority is coextensive with the authority of the federal Equal Employment Opportunity Commission (EEOC).[12] According to the

---

[11] After the trial court issued its decision, the commission filed a motion for reconsideration, contending that the court improperly relied on federal case law holding that compensatory damages are available for a violation of the ADA to support its conclusion that the human rights referee properly had awarded damages for emotional distress. The commission contended that the court should modify its decision to reflect the fact that the referee determined that the board had violated § 46a-58 (a), not that it had violated the ADA, and, therefore, damages properly were awarded pursuant to § 46a-86 (c). The trial court denied the motion.

[12] "The [commission] is a deferral agency under which it has a work-sharing arrangement with the EEOC, whereby it is authorized to accept charges for the EEOC. [When] both the EEOC and [the commission] have jurisdiction, two charges are taken so that the matter may be dual-filed,

Board of Education *v.* Commission on Human Rights & Opportunities

board, in a proceeding under Title II of the ADA (Title
II), § 42 U.S.C. § 12131 et seq., governing discrimination
in the provision of public services, the EEOC has
authority only to conduct an investigation, to reach a
voluntary resolution, or to file a lawsuit; see *Mach Min-
ing, LLC* v. *Equal Employment Opportunity Commis-
sion*, 575 U.S. 480, 483–84, 135 S. Ct. 1645, 191 L. Ed.

thus preserving both the state and federal rights of the charging party.”
(Internal quotation marks omitted.) *Ortiz* v. *Prudential Ins. Co.*, 94 F. Supp.
2d 225, 231 (D. Conn. 2000).

The board contends that the EEOC is charged with enforcement of the
rights established by Title II of the ADA (Title II), § 42 U.S.C. § 12131 et
seq., governing discrimination in the provision of public services, because
“such enforcement is coextensive with the enforcement of rights available
in a private cause of action brought under Title VII of the Civil Rights Act
of 1964, 42 U.S.C. § 2000e-5b . . . .” See 42 U.S.C. § 12133 (2018) (incorpo-
rating rights and remedies set forth in 29 U.S.C. § 794a for violation of Title
II); see also 29 U.S.C. § 794a (a) (1) (2018) (incorporating rights and remedies
set forth in 42 U.S.C. 2000e-16, which is contained in Title VII of Civil Rights
Act of 1964 and governs employment discrimination). The commission does
not dispute this assertion but claims only that, regardless of the scope of
the EEOC’s authority, the commission has authority under state law to
identify ADA violations. We note, however, that 29 U.S.C § 794a (a) (2)
provides that “[t]he remedies, procedures, and rights set forth in title VI of the
Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.) [governing discrimination
on the basis of race, color or national origin in federally assisted programs]
(and in subsection (e) (3) of section 706 of such Act (42 U.S.C. 2000e-5),
applied to claims of discrimination in compensation) shall be available to
any person aggrieved by any act or failure to act by any recipient of Federal
assistance or Federal provider of such assistance under section 794 of this
title.” A number of courts have held that subsection (a) (2) of 29 U.S.C.
§ 794a applies to violations of Title II of the ADA, not subsection (a) (1),
which applies to violations of Title I of the ADA, governing discrimination
in the employment setting. See *Ability Center of Greater Toledo* v. *Sandusky*,
385 F.3d 901, 905 (6th Cir. 2004) (“the remedies, procedures, and rights
available under Title II of the ADA parallel those available under Title VI
of the Civil Rights Act of 1964”); id., 905 n.7 (“the remedies enumerated
[in] § 794a (a) (2) apply in Title II cases”); *Davoll* v. *Webb*, 943 F. Supp.
1289, 1296 n.3 (D. Colo. 1996) (“Title II of the ADA adopts the enforcement
procedures of [§] 505 of the Rehabilitation Act of 1973, i.e., Title VI”), aff’d,
194 F.3d 1116 (10th Cir. 1999). We need not resolve this issue, however,
because, regardless of what federal procedures and remedies are available
for a violation of Title II of the ADA, and regardless of whether the EEOC
has authority to enforce Title II or, if it does, the scope of any such authority,
we conclude that the commission has authority to identify ADA violations
as the basis for finding a violation of § 46a-58 (a).

Board of Education *v.* Commission on Human Rights & Opportunities

2d 607 (2015);[13] but not to adjudicate a claim pursuant to the ADA. Therefore, the board contends, the commission also has no such authority. Second, and derivatively, the board claims that, to the extent that the commission contends that, even if it does not have the authority to directly adjudicate an ADA claim, it has the authority to determine whether a violation of *§ 46a-58 (a)* occurred as the result of an ADA violation, that contention is also incorrect because the commission has no authority to adjudicate whether the ADA was violated in the first instance.[14]

―――――――――

[13] *Mach Mining, LLC,* involved a claim pursuant to Title VII of the Civil Rights Act of 1964. See *Mach Mining, LLC* v. *Equal Opportunity Employment Commission,* supra, 575 U.S. 483. As we explained, the procedures governing a claim pursuant to Title VII do not appear to apply to a claim made pursuant to Title II of the ADA. See footnote 12 of this opinion. As we also explained, this fact has no bearing on our analysis. See id.

[14] The board contends that the trial court's judgment upholding the human rights referee's decision was "based exclusively on [the court's] conclusion that the [commission] had the authority to adjudicate claims brought under the ADA," and the court did not address the issue of whether the board violated § 46a-58 (a). We disagree. The trial court cited *Connecticut Judicial Branch* v. *Gilbert,* Superior Court, judicial district of New Britain, Docket No. HHB-CV-18-6048927 (October 15, 2019) (69 Conn. L. Rptr. 229), rev'd and vacated in part, 343 Conn. 90, 272 A.3d 603 (2022), for the proposition that the commission "could consider a [federal discrimination] claim as a predicate to [a] claim under § 46a-58 (a)." As we discuss subsequently in this opinion, we recently affirmed in relevant part the judgment of the trial court in *Gilbert*; see *Connecticut Judicial Branch* v. *Gilbert,* supra, 343 Conn. 150, and the board concedes that this decision is controlling in the present case. Because our decision in *Gilbert* was released after the commission filed its primary appellate brief, it requested permission to file a notice of supplemental authority addressing this decision, which we granted.

We recognize that, even though the trial court recognized that the referee had found a violation of *§ 46a-58 (a)*, it apparently based its conclusion that the human rights referee properly awarded damages for emotional distress exclusively on federal cases holding that such damages are proper for a violation of the *ADA*. See footnote 11 of this opinion. The board does not dispute on appeal that, if this court concludes that the referee properly found that the board had violated § 46a-58 on the basis of conduct that would constitute a violation of the ADA, the damages award would be proper under § 46a-86 (c). Accordingly, any error by the trial court in this respect was harmless.

Board of Education *v.* Commission on Human Rights & Opportunities

Whether the commission has the authority to identify violations of the ADA presents a legal question subject to plenary review. See, e.g., *Connecticut Judicial Branch* v. *Gilbert*, 343 Conn. 90, 101, 272 A.3d 603 (2022). "To the extent that the issue requires us to interpret the commission's enabling statutes and the state antidiscrimination laws that the commission is responsible for enforcing, we accord deference to the agency's formally articulated interpretation of those statutes when that interpretation is both time-tested and reasonable." Id., 101–102.

At oral argument before this court, the board conceded that this court's recent decision in *Gilbert* is controlling in the present case. In *Gilbert*, the plaintiff, the Connecticut Judicial Branch (branch), contended that the commission had no authority under § 46a-58 (a) to adjudicate claims pursuant to Title VII of the federal Civil Rights Act of 1964, as amended by Title VII of the Civil Rights Act of 1991 (Title VII), 42. U.S.C. § 2000e et seq.[15] Id., 105. This court concluded that the language of § 46a-58 (a) providing that "[i]t shall be a discriminatory practice . . . for any person to subject . . . any other person to the deprivation of any rights . . . secured or protected by the . . . laws . . . of the United States"; (emphasis omitted; internal quotation marks omitted) id., 102; unambiguously "conferred on the commission the authority to identify violations of federal civil rights laws . . . ." Id., 103. With respect to the branch's contention that, because the relevant federal statute authorized only federal courts to formally resolve Title VII claims, the EEOC had no such authority and, in turn, the commission had no such authority; see id., 105–106; this court concluded that "the branch [relied] on a non sequitur insofar as the commission has never purported to adjudicate Title VII

---

[15] *Gilbert* involved a claim of sexual discrimination. See *Connecticut Judicial Branch* v. *Gilbert*, supra, 343 Conn. 97.

Board of Education *v.* Commission on Human Rights & Opportunities

claims . . . .'' Id., 107. Rather, ''§ 46a-58 (a) . . . deems a violation of Title VII to be a violation of *state* antidiscrimination law . . . .'' (Emphasis in original.) Id. This court further concluded that nothing in the federal statutes or legislative history of Title VII evinced ''an intention to bar *state* agencies from identifying Title VII violations for purposes of determining whether *state* law has been violated.''[16] (Emphasis in original.) Id., 109. Accordingly, the court concluded that, ''when the commission finds a Title VII violation as the factual predicate to a violation of § 46a-58 (a), it does so as a matter of Connecticut state law . . . .'' Id., 114.

As we indicated, the board concedes in the present case that our reasoning in *Gilbert* with respect to Title VII claims applies equally to the board's claim that the commission has no authority to adjudicate claims pursuant to Title II of the ADA. Accordingly, we conclude that the trial court correctly determined that the commission has the authority to identify ADA violations for purposes of determining whether § 46a-58 (a) has been violated.

II

We next address the board's contention that the commission lacked jurisdiction over the ADA claim because the substance of the claim is that A was denied a FAPE under the IDEA, and, therefore, M was required by 20

[16] Thus, in addition to relying on the plain and unambiguous language of § 46a-58 (a), the court in *Gilbert* relied on cases construing Title VII and the legislative history of that statutory scheme to support its conclusion that the commission had the authority to identify Title VII violations as a basis for finding a violation of § 46a-58 (a). See *Connecticut Judicial Branch* v. *Gilbert*, supra, 343 Conn. 109–15. Neither the board nor the commission has referred us to comparable case law and legislative history regarding Congressional intent with respect to the ADA. As we indicated, however, the board has conceded that its claim is indistinguishable from the claim that we rejected in *Gilbert* and does not contend that Congress intended to bar state agencies from identifying violations of Title II of the ADA for purposes of providing a state remedy.

Board of Education *v.* Commission on Human Rights & Opportunities

U.S.C. § 1415 (*l*)[17] to exhaust his administrative remedies under the IDEA before filing a complaint with the commission on A's behalf, and he failed to do so. We disagree.

As a preliminary matter, we consider whether this issue is properly before us when the board failed to raise the issue in the proceedings before the human rights referee.[18] See, e.g., *Ferraro* v. *Ridgefield European Motors, Inc.*, 313 Conn. 735, 759, 99 A.3d 1114 (2014) (rule that reviewing court is not required to consider claim unless it was distinctly raised before initial decision maker applies to appeals from administrative proceedings). Because the board claims that M failed

---

[17] Title 20 of the 2018 edition of the United States Code, § 1415 (*l*), provides: "Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this subchapter."

[18] As we explained, after the trial court remanded the matter to the human rights referee to address the question of whether the board had violated the ADA, the referee observed that the board had not raised the exhaustion claim at the initial public hearing on the complaint and that the trial court had not requested that the referee address the issue in its remand order. Nevertheless, after receiving the referee's articulation, the trial court addressed the issue and concluded that M was not required to exhaust his remedies under the IDEA because the claim did not involve a request for a FAPE. For reasons that are unclear to us, the commission makes no claim that this issue is not reviewable because the board failed to exhaust its administrative remedies by raising the issue in the initial proceedings before the human rights referee, even though it does raise that claim with respect to the board's claim that a public school is not a place of public accommodation. Although the commission has not raised the issue of whether the board's exhaustion claim is reviewable on appeal, the parties have briefed the issue of the reviewability of unpreserved jurisdictional claims in administrative appeals in their briefs relating to the place of public accommodation claim. We address the issue in order to clarify the legal principles governing the review of unpreserved jurisdictional claims in administrative appeals and because addressing that issue will not prejudice the board or the commission.

Board of Education *v.* Commission on Human Rights & Opportunities

to exhaust his remedies under the IDEA before filing his complaint with the commission, the claim implicates the commission's subject matter jurisdiction. Cf., e.g., *Garcia* v. *Hartford*, 292 Conn. 334, 338–39, 972 A.2d 706 (2009) (failure to exhaust administrative remedies implicates trial court's subject matter jurisdiction). A claim that an agency lacked subject matter jurisdiction may be raised at any time. E.g., *Ross* v. *Planning & Zoning Commission*, 118 Conn. App. 55, 60, 982 A.2d 1084 (2009). We conclude, therefore, that the issue was properly before the trial court and is properly before this court.

In reaching this conclusion, we are mindful that, as the commission points out, this court has held that an agency is competent, and must be given the opportunity, to determine its own jurisdiction before a party can challenge the agency's jurisdiction in court.[19] See *Cannata* v. *Dept. of Environmental Protection*, 215 Conn. 616, 622, 577 A.2d 1017 (1990). In *Cannata*, the named defendant, the Department of Environmental Protection (department), ordered the plaintiffs to cease and desist from cutting down trees in an area subject to certain environmental regulations because they had failed to obtain a permit. Id., 619–20. The plaintiffs appealed from the order to the trial court, which dismissed the appeal because they had failed to exhaust

[19] The board cites *Aaron* v. *Conservation Commission*, 178 Conn. 173, 179, 422 A.2d 290 (1979), for the proposition that "resort to administrative agency procedures will not be required when the claims sought to be litigated are jurisdictional." In *Cannata* v. *Dept. of Environmental Protection*, 215 Conn. 616, 621 n.7, 577 A.2d 1017 (1990), the court expressly stated that this court's decision in *Greater Bridgeport Transit District* v. *Local Union 1336, Amalgamated Transit Union*, 211 Conn. 436, 559 A.2d 1113 (1989), had overruled this holding in *Aaron*. See id., 439; see also *Sastrom* v. *Psychiatric Security Review Board*, 105 Conn. App. 477, 483 n.3, 938 A.2d 1233 (2008) (*Greater Bridgeport Transit District* overruled *Aaron* as applied in cases in which adequate administrative remedy is available, but plaintiff need not exhaust administrative remedy if there is no mechanism for judicial review of agency's jurisdictional ruling).

Board of Education *v.* Commission on Human Rights & Opportunities

their administrative remedies by applying for a permit. Id., 620. The plaintiffs then appealed to this court, claiming that the department had no jurisdiction over their activities. We observed that, "[w]hen a particular statute authorizes an administrative agency to act in a particular situation it necessarily confers [on] such agency authority to determine whether the situation is such as to authorize the agency to act—that is, to determine the coverage of the statute—and this question need not, and in fact cannot, be initially decided by a court." (Internal quotation marks omitted.) Id., 623. Accordingly, we affirmed the judgment of the trial court. Id., 633.

We conclude that *Cannata* is distinguishable from the present case. First, unlike the plaintiffs in *Cannata*, the board did not deliberately bypass an *administrative proceeding* that could have provided adequate administrative relief when it raised the exhaustion claim in the trial court.[20] Rather, its failure to raise the claim before the human rights referee appears to have been the result of an oversight during the course of the only administrative procedure in which the board could have raised the claim, which itself was pursued to its conclusion. In other words, we conclude that there is a difference between bypassing an administrative procedure on the ground that the agency has no jurisdiction over the matter, which raises an exhaustion issue, and failing, within the context of an administrative proceeding, to

---

[20] In other cases in which this court or the Appellate Court has concluded that an agency must determine its own jurisdiction in the first instance, the plaintiffs also bypassed available administrative procedures. See *O & G Industries, Inc.* v. *Planning & Zoning Commission*, 232 Conn. 419, 425, 655 A.2d 1121 (1995); *Greater Bridgeport Transit District* v. *Local Union 1336, Amalgamated Transit Union*, 211 Conn. 436, 439, 559 A.2d 1113 (1989); *Metropolitan District* v. *Commission on Human Rights & Opportunities*, 180 Conn. App. 478, 511, 184 A.3d 287, cert. denied, 328 Conn. 937, 184 A.3d 267 (2018); *Sastrom* v. *Psychiatric Security Review Board*, 105 Conn. App. 477, 482, 938 A.2d 1233 (2008).

344 Conn. 603      SEPTEMBER, 2022      623

Board of Education *v.* Commission on Human Rights & Opportunities

preserve for review a claim that the agency has no jurisdiction. When a party has failed to preserve a claim before an administrative agency, the exhaustion doctrine does not apply; instead, we apply the ordinary rules governing appellate review of unpreserved claims.

Second, we emphasized in *Cannata* that the jurisdictional issue in that case involved "factual determinations best left to the [department]. This is precisely the type of situation that calls for agency expertise. Relegating these determinations to the [department] in the first instance will provide a complete record containing the [department's] interpretation of the relevant statutory provisions for judicial review." Id., 627. In the present case, the jurisdictional claim involves the proper interpretation of state and federal statutory schemes that are not administered by the commission and that this court is equally competent to interpret.[21] Moreover, there is no claim that the record is inadequate for review of the issue. Accordingly, we conclude that we may review the claim.

We turn, therefore, to the merits of the board's claim that the commission lacked jurisdiction to entertain the complaint because M was required by 20 U.S.C. § 1415 (*l*) to exhaust his administrative remedies under the IDEA before filing a complaint with the commission. A determination as to an agency's subject matter jurisdiction is a question of law subject to plenary review. E.g., *Ross* v. *Planning & Zoning Commission*, supra, 118 Conn. App. 58.[22] "In this regard, a court must take

---

[21] Specifically, as we discuss more fully hereinafter, we must determine the applicability of the requirement that parties claiming that they were denied a FAPE exhaust their remedies under General Statutes § 10-76h, which is administered by the commissioner of education. In making this determination, we are guided by case law construing the IDEA exhaustion requirement.

[22] We stated in *Gilbert* that, "[t]o the extent that the issue requires us to interpret the commission's enabling statutes and the state antidiscrimination laws that the commission is responsible for enforcing, we accord deference to the agency's formally articulated interpretation of those statutes when

Board of Education *v.* Commission on Human Rights & Opportunities

the facts to be those alleged in the complaint, including those facts necessarily implied from the allegations, construing them in a manner most favorable to the pleader. . . . In undertaking this review, we are mindful of the well established notion that, in determining whether . . . subject matter jurisdiction [exists], every presumption favoring jurisdiction should be indulged.'' (Internal quotation marks omitted.) *Graham* v. *Friedlander*, 334 Conn. 564, 571, 223 A.3d 796 (2020).

The IDEA requires that, ''before the filing of a civil action under such laws seeking relief that is also available under this subchapter [of the IDEA], the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this subchapter.'' 20 U.S.C. § 1415 (*l*) (2018). The board contends that this court held in *Graham* v. *Friedlander*, supra, 334 Conn. 564, that ''the IDEA's exhaustion rule applies to state law causes of action.'' To the contrary, this court concluded in *Graham* that the plain language of 20 U.S.C. § 1415 (*l*) provides that exhaustion of IDEA remedies is required *only* when a civil action seeking relief for the denial of a FAPE is brought under ''the United States [c]onstitution, the [ADA] . . . [T]itle V of the Rehabilitation Act of 1973, and the [IDEA] itself,'' *not* when a party has raised state law claims. (Internal quotation marks omitted.) *Graham* v. *Friedlander*, supra, 573. We also concluded in *Graham* that, although the IDEA's exhaustion rule did not apply, ''our state legislature created an exhaustion requirement for state law claims that seek relief from the denial of a FAPE.'' Id., 574. Specifically,

---

that interpretation is both time-tested and reasonable.'' *Connecticut Judicial Branch* v. *Gilbert*, supra, 343 Conn. 101–102. In the present case, our determination is guided by the implicit exhaustion requirement contained in General Statutes § 10-76h and by the United States Supreme Court's interpretation of the IDEA's exhaustion requirement. Because the commission is not responsible for implementing § 10-76h or the IDEA, its interpretation is entitled to no deference.

344 Conn. 603 SEPTEMBER, 2022 625

Board of Education *v.* Commission on Human Rights & Opportunities

persons who raise such claims must exhaust the remedies provided by General Statutes § 10-76h.[23] Id., 574–75. Accordingly, we agree with the board to the extent that it claims that M would be required to exhaust the available state remedies provided by § 10-76h before he could file the complaint, *if* the complaint to the commission actually sought relief for the denial of a FAPE.

We must determine, therefore, whether the complaint filed with the commission, in fact, sought relief for the denial of a FAPE. "To make this determination, we look to the recent decision of the United States Supreme Court in *Fry* v. *Napoleon Community Schools*, [580 U.S. 154, 137 S. Ct. 743, 197 L. Ed. 2d 46 (2017)], for guidance . . . ." *Graham* v. *Friedlander*, supra, 334 Conn. 580. Under *Fry*, courts making this determination should consider two factors. Id. "The first factor requires consideration of whether the claim could have been

---

[23] "Under § 10-76h (a) (1), a parent of a child requiring special education and related services 'may request a hearing of the local or regional board of education or the unified school district responsible for providing such services whenever such board or district proposes or refuses to initiate or change the identification, evaluation or educational placement of or provision of a free appropriate public education to such child or pupil.' The request must be made in writing, contain a statement of the specific issues in dispute, and be requested within two years of the board's proposal or refusal to initiate a change in the child's education plan. General Statutes § 10-76h (a) (1) through (4).

"Upon receipt of the written request, 'the Department of Education shall appoint an impartial hearing officer who shall schedule a hearing . . . pursuant to the [IDEA] . . . .' General Statutes § 10-76h (b). Section 10-76h requires the Department of Education to provide training to hearing officers, delineates who may act as hearing officers and members of hearing boards, identifies the parties that shall participate in a prehearing conference to attempt to resolve the dispute, and describes the authority that the hearing officer or board of education shall have. See General Statutes § 10-76h (c) and (d). Section 10-76h also establishes the processes for appealing from decisions of the hearing officer or the board of education. Section 10-76h (d) (4) provides in relevant part: 'Appeals from the decision of the hearing officer or board shall be taken in the manner set forth in section 4-183 . . . .' " *Graham* v. *Friedlander*, supra, 334 Conn. 574–75.

Board of Education *v.* Commission on Human Rights & Opportunities

brought outside the school setting. . . . The second factor requires consideration of the history of the proceedings prior to the filing of the complaint.'' (Citation omitted.) Id., 580–81.

"The first factor—whether the claim could have been brought outside the school setting—can be evaluated in the form of two hypothetical questions: First, could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was *not* a school—say, a public theater or library? And second, could an *adult* at the school—say, an employee or visitor—have pressed essentially the same grievance? . . . If the answer to both questions is yes, then it is unlikely that the complaint is about the denial of a FAPE.'' (Citation omitted; internal quotation marks omitted.) Id., 581.

Applying these factors in the present case, we conclude that M's complaint did not, in fact, seek relief for the denial of a FAPE. We acknowledge at the outset that our analysis is somewhat hampered by the informal and nontechnical pleading requirements in discrimination proceedings before the commission. We note, for example, that M was not required to, and did not, specify the relief that he was seeking in the complaint that he filed on A's behalf. Nevertheless, viewing the complaint and the proceedings before the commission in their entirety and in the light most favorable to a finding of jurisdiction, we are persuaded that M was not required to exhaust his remedies under § 10-76h before filing the complaint.

In reaching this conclusion, our decision in *Graham* v. *Friedlander*, supra, 334 Conn. 564, is instructive. In *Graham*, we concluded that the plaintiffs' complaint alleging that the defendants, including the Norwalk Board of Education, had engaged in negligent hiring and supervision of various persons and entities that

Board of Education *v.* Commission on Human Rights & Opportunities

had provided autism related services to the plaintiffs' children, was not, in fact, a claim for the denial of a FAPE; id., 566–67; because "the plaintiffs could have brought essentially the same claim if they attended a municipal summer camp that touted a unique special needs program . . . [but] was run by uncertified and unqualified staff." Id., 581. Similarly, in the present case, M could have filed a complaint with the commission containing the same claim if a municipal summer camp for children with special needs had unilaterally dismissed A on the basis of his post-concussion syndrome.

We further concluded in *Graham* that "an adult participating in a municipally funded behavioral therapy treatment program offered in the evenings at a school could also bring the same claim for regression resulting from services provided by an uncertified and unqualified behavior therapist." Id., 582. Similarly, in the present case, an adult could bring the same claim if he or she were unilaterally dismissed from such a program on the basis of a physical disability.

The board disputes these conclusions and contends that, because the gravamen of M's complaint was that A was deprived of special education services, M was seeking relief for the denial of a FAPE. Specifically, the board contends that, "[b]ecause this case ultimately involves [A's] disenrollment from the school immediately after a [planning and placement team] meeting was held to discuss [A's] designation as a special education student, the alleged conduct is limited to the school setting. No other public facility can designate a student as 'special education' or provide a student with access to special education services, and, conversely, no other public facility can withdraw a student from those services." We disagree. In *Graham*, the defendants similarly claimed that, because the plaintiffs' complaint focused on the children's receipt of inadequate special education services, they were seeking relief for the

Board of Education *v.* Commission on Human Rights & Opportunities

denial of a FAPE. *Graham* v. *Friedlander*, supra, 334 Conn. 584. We rejected this claim, concluding that "[t]he fact that the plaintiffs used the words inability to provide adequate services, does not automatically transform the claim into one alleging the denial of a FAPE or automatically subject the claim to an exhaustion requirement. The court in *Fry* warned against this kind of magic word approach. . . . The use (or [nonuse]) of particular labels and terms is not what matters. . . . What matters is the substance of the complaint." (Citations omitted; internal quotation marks omitted.) Id., 586.

We used the following hypothetical to illustrate this point: "If a teacher hits a special education student over the head and the student misses school for two weeks due to a concussion, the child could still bring an assault claim against the teacher, even though one of the harms alleged in the complaint could be that the child did not receive special education services for two weeks while recovering from the injury. The mere acknowledgment that the child received inadequate services for two weeks would not [however] make the claim one for the denial of a FAPE. The claim would remain one for assault." Id., 586–87. Similarly, in the present case, the fact that A was unable to take advantage of the educational services offered at John Daniels when the board unilaterally withdrew him from the school because of his post-concussion syndrome does not convert his claim for discrimination on the basis of disability into a claim for a denial of a FAPE. The former claim "implicate[s] those . . . intangible consequences of discrimination . . . such as stigmatization and deprivation of opportunities for enriching interaction with [his former] fellow students"; (internal quotation marks omitted) *Lawton v. Success Academy Charter School, Inc.*, 323 F. Supp. 3d 353, 362 (E.D.N.Y. 2018); whereas the latter claim implicates a loss of educational services.

Board of Education *v.* Commission on Human Rights & Opportunities

The second *Fry* factor—the history of the proceedings—bolsters our conclusion. Although A's parents were undoubtedly seeking a FAPE while A was enrolled at John Daniels, including filing a request for a mediation with the state Board of Education to restore A's designation as a special education student, they never invoked the formal procedures for filing a due process complaint or requesting a hearing pursuant to § 10-76h. See *Graham* v. *Friedlander*, supra, 334 Conn. 588 (fact that plaintiffs never invoked formal procedures for seeking relief for denial of FAPE supported court's conclusion that they were seeking relief for something else). Moreover, M never asked the human rights referee during the proceedings on the complaint to order the board to reenroll A at John Daniels, to designate him as a special education student, or to provide him with appropriate educational services. Indeed, there is no reason to believe that they wanted or would be entitled to such relief because, before the beginning of the school year immediately following his withdrawal from John Daniels, A's parents enrolled him in another school where, as far as the record shows, he received a FAPE.[24]

--------

[24] The complaint does allege that the board "failed to readmit" A, and it is arguable that, if the matter had been adjudicated promptly, A's parents could have sought readmission. It is also arguable that A's parents could have asked for educational services to compensate for the fact that A did not receive homebound educational services for the several weeks of the 2010–11 school year following his withdrawal from John Daniels. See, e.g., *Branham* v. *District of Columbia*, 427 F.3d 7, 9 (D.C. Cir. 2005) (compensatory education awards, such as tutoring to compensate for past failure to provide FAPE, may be available for IDEA violations if "reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place" (internal quotation marks omitted)). There is no indication in the record, however, that A's parents had any intention to seek such remedies, and the *Fry* inquiry is designed to determine "whether a lawsuit in fact seeks relief available under the IDEA—not, as a stricter exhaustion statute might, whether the suit *could have* sought relief available under the IDEA (or, what is much the same, whether any remedies are available under that law)." (Emphasis added; internal quotation marks omitted.) *Fry* v. *Napoleon Community Schools*, supra, 580 U.S. 169. The board makes no claim that a different standard applies to the requirement under state law

Board of Education *v.* Commission on Human Rights & Opportunities

We further note that, for reasons that are unclear from the record, the human rights referee did not hold a hearing on the complaint until March, 2016, almost five years after A was withdrawn from John Daniels. The board has not explained precisely what relief would have been available under § 10-76h to remedy the harm done as a result of A's withdrawal at that time, much less when and how such relief was actually requested. We conclude, therefore, that M was not required to exhaust his administrative remedies before he filed the complaint with the commission on A's behalf.

To support its claim to the contrary, the board relies on the Appellate Court's recent decision in *Phillips* v. *Hebron*, 201 Conn. App. 810, 244 A.3d 964 (2020).[25] In *Phillips*, the minor plaintiff, who had been diagnosed with Down syndrome and was without functional speech, attended kindergarten in an elementary school in the town of Hebron. Id., 812. During a visit to the school, the plaintiff's father discovered that the plaintiff's desk and chair were located in the coatroom of the kindergarten classroom. Id., 813. Subsequent inquiries revealed that the plaintiff slept 2.5 hours per day in the

---

that remedies pursuant to § 10-76h must be exhausted before seeking relief in other state forums.

We are mindful that "a disabled student claiming deficiencies in his or her education may not ignore the administrative process, then later sue for damages." *Polera* v. *Board of Education*, 288 F.3d 478, 488 (2d Cir. 2002). This simply means, however, that the student may not ignore the administrative process for the denial of a FAPE and later sue for damages *for that specific harm*; it does not mean that a disabled student may not seek damages outside of the administrative process *for some other harm* that happened to also result in the denial of a FAPE. See *Graham* v. *Friedlander*, supra, 334 Conn. 586–87 (student who is deprived of FAPE as result of physical assault by teacher may seek damages for injuries caused by assault without exhausting remedies for denial of FAPE, even if assault resulted in deprivation of FAPE).

[25] Because the Appellate Court's decision in *Phillips* was released after the commission filed its primary appellate brief, the commission requested permission to file a supplemental brief addressing the decision, which we granted.

Board of Education *v.* Commission on Human Rights & Opportunities

coatroom and spent 40 minutes per day on average working on classwork or projects in that space. Id., 813–14. The plaintiff's father submitted a special education complaint form (state complaint) and a request for a due process hearing to the Bureau of Special Education. Id., 815. The state complaint sought, among other things, modifications to the plaintiff's individualized education plan. Id. After the defendant Hebron Board of Education filed a motion to dismiss the request for a due process hearing, the plaintiff's father withdrew the request and asked the department to investigate the state complaint. Id., 816. Upon concluding its investigation, the department issued a report in which it found that the plaintiff had not been denied a FAPE and stated that the parties were entitled to request a due process hearing if they disagreed with the report's conclusions. Id. The plaintiff's father did not file a request for a hearing but, instead, brought an action against the Hebron Board of Education and certain of its employees, alleging, among other things, that they had discriminated against him on the basis of his disability in violation of § 46a-58 (a) and General Statutes § 46a-75 (a) and (b). Id., 819. The defendants filed a motion to dismiss the complaint on the ground that the plaintiff's father had failed to exhaust his administrative remedies for the denial of a FAPE, which the trial court granted. Id., 822–24.[26]

On appeal, the Appellate Court concluded that, read in the context of the core allegations of the complaint;

[26] The defendants in *Phillips* contended that the plaintiff was required to exhaust his remedies pursuant to the IDEA, and trial court agreed. *Phillips* v. *Hebron*, supra, 201 Conn. App. 823–84. Thereafter, this court released its decision in *Graham* v. *Friedlander*, supra, 334 Conn. 564, which held that the IDEA's exhaustion requirement did not apply to claims made pursuant to state law but, instead, that plaintiffs raising state law claims alleging the denial of a FAPE are required to exhaust the remedies provided by § 10-76h. During oral argument before the Appellate Court, the plaintiff in *Phillips* conceded that there is a state exhaustion requirement for state claims seeking a remedy for the denial of a FAPE. *Phillips* v. *Hebron*, supra, 829 n.16.

Board of Education *v.* Commission on Human Rights & Opportunities

namely, that the defendants had violated the plaintiff's rights under the IDEA; id., 835; the plaintiff's purported discrimination claims, in fact, sought ''redress for the defendants' failure to provide a FAPE . . . .'' (Footnote omitted.) Id., 839. The court reasoned that, under the first *Fry* factor, ''the plaintiff could not sue a public facility for failing to educate him in the least restrictive environment; nor could an adult sue the school on such a basis.'' Id. Applying the second *Fry* factor, the history of the proceedings, the court observed that, before the plaintiff's father filed the complaint, he sought a due process hearing on the ground that the plaintiff had been denied a FAPE. Id., 841. Accordingly, the Appellate Court affirmed the trial court's judgment with respect to the exhaustion issue. Id., 845.

We are not persuaded by the board's contention that the Appellate Court's decision in *Phillips* supports its position. As we explained, unlike the complaint in *Phillips*, the complaint in the present case did not allege that the board had violated A's rights under the IDEA or, indeed, make any reference to the IDEA or to A's right to a FAPE, and, unlike the plaintiff in *Phillips*, neither A nor his parents ever invoked the administrative proceedings designed to remedy the denial of a FAPE. We conclude, therefore, that the trial court correctly determined that M was not required to exhaust his remedies pursuant to § 10-76h before he filed the complaint with the commission on A's behalf.

III

Finally, we address the board's claim that the commission lacked jurisdiction over M's claim pursuant to § 46a-64 because a public school is not a place of public accommodation. The board concedes that it did not raise this claim before the human rights referee but contends that the trial court improperly declined to address the claim because it was jurisdictional, and a

jurisdictional claim may be raised at any time. See, e.g., *Ross* v. *Planning & Zoning Commission*, supra, 118 Conn. App. 60. The commission contends that, to the contrary, the board's claim does not implicate its subject matter jurisdiction and the claim is, therefore, unreviewable. See *Ferraro* v. *Ridgefield European Motors, Inc.*, supra, 313 Conn. 759 (rule that reviewing court is not required to consider claim unless it was distinctly raised before initial decision maker applies to appeals from administrative proceedings). We agree with the commission that the claim is not reviewable.

This court previously has had occasion to discuss the "ongoing confusion as to whether the failure to plead or prove an essential fact [for purposes of invoking a statutory remedy] implicates the [tribunal's] subject matter jurisdiction or its statutory authority." *In re Jose B.*, 303 Conn. 569, 572, 34 A.3d 975 (2012). We noted in *In re Jose B.* that, "[o]nce it is determined that a tribunal has authority or competence to decide the class of cases to which the action belongs, the issue of subject matter jurisdiction is resolved in favor of entertaining the action." (Internal quotation marks omitted.) Id. 574. We further noted that the question of whether the action belongs to the class of cases that the tribunal has authority to decide is "[s]eparate and distinct from . . . the question of whether a [tribunal] . . . properly exercises its statutory authority to act." (Internal quotation marks omitted.) Id., 574–75. A challenge to the tribunal's statutory authority "raises a claim of statutory construction that is not jurisdictional." (Internal quotation marks omitted.) Id., 573. After discussing a number of cases in which this court and the Appellate Court applied these principles with disparate results, we concluded that a claim that a party has failed to allege or to establish an element of a statutory remedy implicates the tribunal's statutory authority and the legal suffi-

Board of Education *v.* Commission on Human Rights & Opportunities

ciency of the complaint, not the tribunal's subject matter jurisdiction.[27] Id., 579.

In the present case, the complaint alleged that the board had violated § 46a-64 by discriminating against A on the basis of his disabilities in a place of public accommodation. Such a claim is within the class of cases that the commission has authority or competence to decide. We conclude, therefore, that the commission had subject matter jurisdiction to entertain the complaint. See id., 574.

In support of its claim to the contrary, the board essentially contends that, because a public school is *not* a place of public accommodation *as a matter of law*, the commission lacked subject matter jurisdiction. We disagree. In the cases that we cited in our discussion in *In re Jose B.* regarding the distinction between statutory authority and subject matter jurisdiction, the alleged jurisdictional deficiencies also involved questions of law.[28] We concluded that the trial court's juris-

---

[27] Thus, we implicitly overruled the cases that had reached a contrary conclusion on that point, namely, *Amore* v. *Frankel*, 228 Conn. 358, 636 A.2d 786 (1994), and *Kennedy* v. *Kennedy*, 177 Conn. 47, 411 A.2d 25 (1979). See *In re Jose B.*, supra, 303 Conn. 575–76 (discussing *Kennedy*); id., 577–79 (discussing *Amore*); id., 579 ("to the extent that the cases are inconstant, the better rule is set forth in" cases holding that failure to allege essential facts under particular statute goes to legal sufficiency of complaint, not to subject matter jurisdiction (internal quotation marks omitted)).

[28] See *In re Jose B.*, supra, 303 Conn. 574 (citing *Amodio* v. *Amodio*, 247 Conn. 724, 728, 724 A.2d 1084 (1999), in which court considered whether Appellate Court correctly determined, sua sponte, that trial court did not have jurisdiction to modify support order pursuant to General Statutes § 46b-86 (a) because support agreement precluded modification unless defendant's weekly income exceeded $900); *In re Jose B.*, supra, 575 (citing *New England Retail Properties, Inc.* v. *Maturo*, 102 Conn. App. 476, 482, 925 A.2d 1151, cert. denied, 284 Conn. 912, 931 A.2d 932 (2007), in which court considered whether, under statute prohibiting commencement of action against estate unless legal claim has been rejected by estate, claim that estate had not rejected legal claim implicated court's subject matter jurisdiction); *In re Jose B.*, supra, 575 (citing *Kennedy* v. *Kennedy*, 177 Conn. 47, 49, 411 A.2d 25 (1979), in which trial court concluded that it lacked jurisdiction to issue support orders pertaining to children over age of eighteen when legislature had lowered age of majority from twenty-one years of age to eighteen); *In*

344 Conn. 603 SEPTEMBER, 2022 635

Board of Education *v.* Commission on Human Rights & Opportunities

diction was not implicated in any of these cases, but, instead, the claims implicated the trial court's statutory authority and the legal sufficiency of the complaints. Id., 579. We conclude, therefore, that the board's claim that the trial referee incorrectly determined that a public school is a place of public accommodation is not reviewable because it does not implicate the commission's subject matter jurisdiction.[29]

In summary, we conclude that the trial court correctly determined that the commission had jurisdiction to

_____

*re Jose B.*, supra, 576 (citing *Gurliacci* v. *Mayer*, 218 Conn. 531, 543–44, 590 A.2d 914 (1991), in which defendant claimed that trial court lacked subject matter jurisdiction over claim because plaintiff had not alleged statutory exception to Workers' Compensation Commission's exclusive jurisdiction over intraworkplace claims); *In re Jose B.*, supra, 577–79 (citing *Amore* v. *Frankel*, 228 Conn. 358, 362, 636 A.2d 786 (1994), in which defendant claimed that trial court lacked jurisdiction over claim because it did not fall with statutory exception to sovereign immunity).

[29] We note, for the benefit of future litigants, that, regardless of whether a public school is a place of public accommodation for purposes of § 46a-64, students who claim that they were discriminated against in a public school on the basis of a protected characteristic, including a disability, may seek the remedies provided by § 46a-86 by filing a complaint pursuant to § 46a-58 alleging that they have been discriminated against in violation of General Statutes § 10-15c. See *Commission on Human Rights & Opportunities* v. *Board of Education*, 270 Conn. 665, 701, 706, 855 A.2d 212 (2004) (student who claimed that he was discriminated against on basis of race in public school in violation of § 10-15c could file complaint with commission pursuant to § 46a-58 and seek remedies provided by § 46a-86); see also General Statutes § 10-15c (a) ("[t]he public schools shall be open to all children five years of age and over . . . and each such child shall have . . . an equal opportunity to participate in the activities, programs and courses of study offered in such public schools . . . without discrimination on account of race, as defined in section 46a-51, color, sex, gender identity or expression, religion, national origin, sexual orientation or disability"); General Statutes § 46a-58 (a) (it is discriminatory practice to deprive person of right protected by law of this state on basis of protected status); General Statutes § 46a-86 (providing remedies for violation of § 46a-58).

The provision of § 10-15c prohibiting discrimination in public schools on the basis of a disability was added to the statute in 2021; see Public Acts, Spec. Sess. June, 2021, No. 21-2, § 405; and, therefore, a claim pursuant to that statute was not available in the present case but would be for claims after the 2021 amendment.

636 SEPTEMBER, 2022 344 Conn. 603

Board of Education *v.* Commission on Human Rights & Opportunities

identify violations of the ADA for the purpose of determining whether the board violated § 46a-58 (a) and that it correctly determined that M was not required to exhaust the remedies provided by § 10-76h before filing his discrimination complaint with the commission. We further conclude that the board's claim that the human rights referee incorrectly determined that a public school is not a place of public accommodation for purposes of § 46a-64 (a) is not reviewable.

The judgment is affirmed.

In this opinion the other justices concurred.